UNITED STATES of America, ex rel.
George DUNCAN, Petitioner-Appellee,

v.

Michael O'LEARY, Warden,
Respondent-Appellant.

No. 85–2761.

United States Court of Appeals,
Seventh Circuit.

Argued May 27, 1986.

Decided Nov. 24, 1986.

Rehearing Denied Dec. 22, 1986.

Robert Agostinelli, Office of the State Appellate Defender, Ottawa, Ill., for petitioner-appellee.

Mark L. Rotert, Asst. Atty. Gen. State of Ill., Chicago, Ill., for respondent-appellant.

Before CUMMINGS, EASTERBROOK and RIPPLE, Circuit Judges.

CUMMINGS, Circuit Judge.

This case comes to us on appeal following the district court's grant of petitioner George Duncan's ("petitioner's") petition for writ of habeas corpus. For the reasons set forth below, we affirm the decision of the district court.[1]

## I

The facts as developed in state post-trial proceedings and the district court's habeas evidentiary hearing are largely as follows: Petitioner was indicted February 19, 1980, for the murder of his girlfriend, Yvette Searle. Initially, petitioner retained Thomas Penn as defense counsel, and petitioner's family paid Penn a fee of $6,000. In April 1980, the family discharged Penn, apparently because Penn insisted that petitioner plead guilty to the murder charge. Petitioner thus needed a defense attorney.

Subsequently, Chris Duncan, petitioner's brother, had occasion to be patrolling on Western Avenue when he saw Assistant State's Attorney Joseph Gibson, defense attorney Dorian LaSaine, and police officer Patricia Bonacum standing outside Gibson's residence. Duncan stopped to talk to Gibson, and LaSaine then joined the conversation. The subject of petitioner's defense and his problems in selecting an attorney arose, and LaSaine told Duncan to come see him about the matter.

LaSaine, Gibson, and Bonacum all played roles in the events that followed. During this time period Gibson was running for State's Attorney of Peoria County. LaSaine and Gibson were close friends and were classmates together in law school. LaSaine was Gibson's campaign manager for this race and continued in this role during petitioner's prosecution which was conducted by Gibson. Gibson's campaign was based upon a "strong law and order" theme, and as such LaSaine and Gibson

had publicized a prior murder trial where Gibson had sought the death penalty.

Following the discussion outside Gibson's house, Duncan went to see LaSaine about representing petitioner. LaSaine requested a fee of $7,500 for the case. Petitioner's family decided that this was more than they could afford, and continued to search for an attorney. Norval Hodges was then retained by petitioner for $5,000, with only $1,000 due before the trial.

Several days after petitioner retained Hodges as defense counsel, Duncan encountered Bonacum at the Peoria police department. Bonacum brought up the subject of petitioner's defense. Bonacum told Duncan that Hodges was not an effective attorney, that he was not known at the courthouse, and that he was "old fashioned." Bonacum further told Duncan that Hodges was trying to get information from the Coroner about petitioner's case when all he had to do was look at the police reports. Bonacum knew both that Hodges was petitioner's attorney and that Hodges was at the Coroner's office as part of his work on the case because her fiance Gibson had previously given her this information. Bonacum then suggested to Duncan that he discuss petitioner's defense further with LaSaine.

Duncan then met again with LaSaine about representing petitioner. This time, LaSaine told Duncan that he would represent petitioner for less than $7,500. Petitioner's family eventually hired LaSaine for $3,500. LaSaine entered his appearance as petitioner's attorney on May 19, 1980, and the trial began May 27, 1980.

LaSaine admitted that he never told Duncan that he was Gibson's campaign manager. LaSaine was not sure whether he had informed petitioner of this fact.

On the day of trial, the court and petitioner engaged in the following colloquy:

---

1. In the district court's order of October 1, 1985, the court stated that petitioner was to be discharged from custody unless, within 120 days, he was retried. On October 9, 1985, respondent filed a motion to stay judgment pending appeal. As of May 27, 1986, the date of oral argument in this case, this motion for stay had not been ruled upon. On May 29, 1986, the district court entered a stay *nunc pro tunc* as of October 18, 1985. We therefore address the merits of this appeal.

THE COURT: Mr. Duncan, I have been advised that your attorney, Mr. LaSaine, is a campaign manager for the Assistant State's Attorney in this case, Mr. Gibson. Mr. Gibson was running for the office of State's Attorney in the November election, and your attorney, Mr. LaSaine, apparently, is his campaign manager, which means that he would be working on behalf of Mr. Gibson in his election.

DEFENDANT DUNCAN: Yes, sir.

THE COURT: Do you understand that?

DEFENDANT DUNCAN: Yes, sir.

THE COURT: Has Mr. LaSaine told you that?

DEFENDANT DUNCAN: Yes.

THE COURT: All right. And I believe it will be my duty to advise you, Mr. Duncan, that there could arise a possible conflict of interest in Mr. LaSaine's representing you in this case. I'm not saying that it is present nor that it would arise, but I have to make you aware of the fact, and I think Mr. LaSaine has already. But I have to make you aware of the fact that there could be what is known in law as a potential conflict of interest in his representing you in this case, a conflict of interest between his representing you and also by reason of his allegiance to Mr. Gibson because of his activities, political activities.

Do you understand?

DEFENDANT DUNCAN: Yes, sir.

THE COURT: Now, have you hired Mr. LaSaine as your attorney?

DEFENDANT DUNCAN: Yes, sir.

THE COURT: And I want to just give you an example of how this potential conflict of interest could arise, how it could affect you.

It can arise, as I say, because of a dual—not a dual representation but a dual—I want to put this in words so I am sure that you'll understand it.

(Pause.)

During the cross examination of witnesses, for example, Mr. Duncan, it might be necessary for Mr. LaSaine to attempt to show up Mr. Gibson, all right? To show up the evidence that he may be attempting to present against you at your trial. And in a very subtle or a very hidden manner, Mr. LaSaine, if this conflict of interest would affect him, could restrain himself from fully representing you by not vigorously cross examining witnesses.

You understand?

DEFENDANT DUNCAN: Yes.

THE COURT: That's one example of a conflict of interest that I'm talking about to you.

Do you understand?

DEFENDANT DUNCAN: Yes, sir.

THE COURT: All right. I'm, in no way, stating his representation of you would be anything than vigorous and honorable, but I am, in no manner, stating to you that that possibility could not possibly exist anyway because of this allegiance, you might call it, to Mr. Gibson.

DEFENDANT DUNCAN: Yes, sir. I have—

THE COURT: Do you understand what I'm saying to you?

DEFENDANT DUNCAN: Yes, sir.

THE COURT: Do you have any questions that you want to ask me about this problem that I'm discussing with you?

DEFENDANT DUNCAN: Well, yes sir. I have complete confidence in Mr. LaSaine, but I didn't know that he was campaign manager.

THE COURT: Uh-huh.

DEFENDANT DUNCAN: But I have complete confidence in him.

THE COURT: All right. Now, I am, in no way, stating that there is any conflict of interest in this case, but it's my duty as a judge to advise you and let you know that there is always that possibility, and you have the right to waive or to give up any possible conflict of interest that there could be in this case, you see, and that's why I'm stating these facts to you. And I'm asking you now, at this time, knowing what I have said to you and understanding what I've said to you, do you wish Mr. LaSaine to continue to represent you in this case?

DEFENDANT DUNCAN: Yes, sir.

THE COURT: Okay. And you understand that you will be giving up any right that you may have at a later time to complain of Mr. LaSaine's representation of you for the reason that there was a conflict of interest because he is involved with Mr. Gibson and Mr. Gibson's political campaign?

DEFENDANT DUNCAN: Yes.

THE COURT: Okay. That's all.

On July 3, 1980, the trial court held a hearing on petitioner's motion for a new trial. Petitioner, now represented by Jerry Serritella, based his motion for a new trial on his claim that LaSaine labored under a conflict of interest that constituted ineffective assistance of counsel *per se.* At this hearing, in addition to most of the facts previously discussed, it was established that petitioner completed eleventh grade and has worked as a car washer. Although he can read and write, he has difficulty understanding spoken English. He was not familiar with campaign procedures, and apparently did not understand the role and function of a campaign manager. He testified subsequent to the trial that he did not know that LaSaine was Gibson's campaign manager, and that his inconsistent responses stemmed from his lack of understanding of the judge's comments. Nevertheless, the trial court determined that petitioner had effectively waived the conflict of interest issue, and denied his motion for a new trial. He was sentenced to a forty-year term of imprisonment.

The Illinois appellate court affirmed the trial court's decision that petitioner's waiver of the conflict issue was made "knowingly and intentionally." *People v. Duncan,* 97 Ill.App.3d 896, 899, 53 Ill.Dec. 654, 424 N.E.2d 67 (3d Dist.1981). Petitioner then filed a petition for post-conviction relief. The state circuit court denied the petition, ruling that the "issues alleged ... have been raised or could have been raised in the trial court or at the appellate stage or in fact were litigated at these stages."

R. 4, Appendix C. The appellate court affirmed this decision.

On July 31, 1984, petitioner filed a petition for writ of habeas corpus in the district court. On January 17, 1985, the district court set the cause for an evidentiary hearing on the issues of whether LaSaine's representation was adversely affected by an actual conflict and whether petitioner had knowingly waived the conflict. An evidentiary hearing on the petition was held June 7, 1985.

The testimony given at this hearing generally supplemented and expanded upon the pertinent facts as developed in the state proceedings, with one major exception. Patricia Brandt, who was employed as LaSaine's secretary from December of 1979 through April of 1981 and had not previously given testimony relating to petitioner's case, testified at this evidentiary hearing. Her testimony significantly changed the facts that were known at that time.

Brandt testified that she overheard a conversation between Gibson and LaSaine that occurred prior to petitioner's retention of LaSaine as defense counsel. In that conversation, Gibson said it would help the campaign if LaSaine represented petitioner, since Gibson had been assigned to prosecute the case. Gibson also suggested that the case would be of financial benefit to LaSaine. Brandt said that Bonacum apparently was to talk to Duncan and to recommend LaSaine as a good trial lawyer. Bonacum telephoned LaSaine's office to report that she had talked with Duncan about the case. LaSaine was upset when he learned that petitioner had retained Hodges as his attorney. LaSaine subsequently was retained by petitioner.

The district court first determined that petitioner did not knowingly and intelligently waive the issue of his attorney's conflict of interest. The court noted that despite petitioner's inconsistent statements as to whether he knew before trial that LaSaine was Gibson's campaign manager, the trial court failed to make a detailed inquiry into petitioner's actual knowledge

of the situation or his knowledge of the role and duties of a political campaign manager. Moreover, neither LaSaine nor Gibson participated in this discussion between the trial court judge and the petitioner. Additionally, petitioner has a limited educational background.

Having found no waiver, the district court proceeded to analyze petitioner's conflict of interest claim. The court proceeded to apply the standard set forth by the Supreme Court in *Cuyler v. Sullivan,* 446 U.S. 335, 348, 350, 100 S.Ct. 1708, 1718, 1719, 64 L.Ed.2d 333 (1980), *i.e.,* whether there was an actual conflict of interest that adversely affected LaSaine's performance. Giving credit to Brandt's testimony, the court found that an actual conflict of interest existed throughout LaSaine's representation of petitioner, and that this conflict adversely affected LaSaine's performance.

Respondent presses several contentions on appeal. First, respondent argues that petitioner, by arguing in state court that there was a *per se* conflict of interest as opposed to an actual conflict that adversely affected LaSaine's performance, committed a procedural default that prevents him from arguing in this Court that an actual conflict of interest occurred. Second, respondent contends that petitioner failed to present credible evidence of collusion among Gibson, LaSaine, and Bonacum, and with no evidence of collusion the district court erred in not concluding that petitioner waived at trial his right to complain of any conflict. Respondent also contends that with no collusion, the district court erred in determining that an actual conflict of interest adversely affected LaSaine's performance.

## II

■ As a general rule, in order to state a claim of ineffective assistance of counsel under the Sixth Amendment, one must show not only that the attorney lacked the requisite degree of professional competence, but also that this lack of competence was so prejudicial that it probably changed the outcome of the criminal defendant's trial. *Strickland v. Washington,* 466 U.S. 668, 691–696, 104 S.Ct. 2052, 2066–2069, 80 L.Ed.2d 674; *Walberg v. Israel,* 766 F.2d 1071, 1075 (7th Cir.1985). However, the degree of prejudice that must be shown is reduced for certain types of ineffectiveness claims. In certain ineffectiveness claims, such as the actual or constructive denial of the assistance of counsel altogether, prejudice is completely presumed. *Strickland,* 466 U.S. at 692, 104 S.Ct. at 2067; *United States v. Cronic,* 466 U.S. 648, 658–659, 659 n. 25, 104 S.Ct. 2039, 2046–2047, 2047 n. 25, 80 L.Ed.2d 657 (1984); *Geders v. United States,* 425 U.S. 80, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976) (cited by *Cronic,* 466 U.S. at 659 n. 25, 104 S.Ct. at 2047 n. 25). If instead defendant's claim is that his attorney was guilty of a conflict of interest, and defendant did not object to this conflict of interest at trial, defendant must show that "an actual conflict of interest adversely affected his lawyer's performance." *Strickland,* 466 U.S. at 692, 104 S.Ct. at 2067, quoting *Cuyler,* 446 U.S. at 348, 100 S.Ct. at 1718; *United States v. Marrera,* 768 F.2d 201, 206–207 (7th Cir.1985). The standard in this latter group of cases (hereinafter referred to as the "*Cuyler* standard") is a limited presumption of prejudice. On the one hand, under the *Cuyler* standard defendant need not show that the trial would probably have come out differently if there had been no conflict of interest, but on the other hand the *Cuyler* standard is not the same as the *per se* rule of prejudice that exists for the ineffectiveness claims listed above. *Strickland,* 466 U.S. at 692, 104 S.Ct. at 2067; *Walberg,* 766 F.2d at 1075.

■ The precise scope of the category of claims to which the *Cuyler* standard applies has not been definitively stated by the Supreme Court. In *Cuyler,* the Court applied this limited presumption standard to a conflict of interest claim involving the multiple representation of clients in a single criminal proceeding. The Court, in dicta, subsequently described this *Cuyler* standard as applying generally to a conflict of interest claim, without limiting its applica-

tion only to multiple representation conflict cases. *Strickland,* 466 U.S. at 692, 104 S.Ct. at 2067. This Court has applied the *Cuyler* standard for conflict of interest claims generally, and not merely those conflict claims that involve multiple representation of criminal defendants. See, *e.g., Marrera,* 768 F.2d at 206–207 (applies standard to case where the alleged conflict is based on the attorney's financial interests). So have courts in other jurisdictions. See cases cited in *Illinois v. Washington,* 469 U.S. 1022, 105 S.Ct. 442, 443, 83 L.Ed.2d 367 (1984) (three Justices, dissenting from denial of certiorari, note that "numerous federal courts have failed to discern in *Cuyler* any limitation to cases involving multiple representation of defendants," and list these cases). However, the Illinois Supreme Court maintains that the *Cuyler* actual-conflict-of-interest standard is limited to conflict cases involving multiple representation of criminal defendants. *People v. Washington,* 101 Ill.2d 104, 77 Ill.Dec. 770, 461 N.E.2d 393 (1984), certiorari denied, 469 U.S. 1022, 105 S.Ct. 442, 83 L.Ed.2d 367. See also *People v. Cunningham,* 107 Ill.2d 143, 89 Ill.Dec. 879, 481 N.E.2d 722 (1985).

In his post-trial motion in state court, his appeal of the denial of this motion, his state post-conviction proceedings, and his initial memorandum in support of his petition for writ of habeas corpus filed in district court, petitioner relied on pre-*Cuyler* law, particularly *Holloway v. Arkansas,* 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978), in arguing that LaSaine's conflict of interest constituted ineffective assistance of counsel *per se.* Petitioner's claim was denied in the state courts because the courts found that he had waived this constitutional right at trial. The district court subsequently ordered an evidentiary hearing to determine whether the claim was waived, and whether the *Cuyler* standard was met (*i.e.,* whether petitioner's trial counsel represented conflicting interests so that an actual conflict of interest adversely affected counsel's performance). Petitioner's subsequent briefs to the district court

and to this Court discussed his claim in terms of the *Cuyler* standard.

Respondent contends that petitioner created a procedural default by arguing his conflict of interest claim in state court in terms of a *per se* standard, rather than the *Cuyler* standard. Respondent thus argues that since there is no cause for this procedural default, and the *Cuyler* standard is the appropriate standard for any type of conflict of interest claim, petitioner is foreclosed from pursuing the conflict of interest claim under the *Cuyler* standard on habeas corpus in the federal courts. It is clear that the failure to raise constitutional deprivations on direct appeal operates as a procedural default and hence a waiver in Illinois. *Dently v. Lane,* 712 F.2d 1172, 1176 (7th Cir.1983), quoting *Goins v. People,* 103 Ill.App.3d 596, 59 Ill.Dec. 312, 313–314, 431 N.E.2d 1069, 1070–1071 (1st Dist. 1981). It is equally well settled that "when a procedural default bars state litigation of a constitutional claim, a state prisoner may not obtain federal habeas relief absent a showing of cause and actual prejudice." *Engle v. Isaac,* 456 U.S. 107, 129, 102 S.Ct. 1558, 1572, 71 L.Ed.2d 783 (1982).

In the instant case, petitioner raised essentially the same claim in both state and federal courts. At all times he has maintained that LaSaine labored under a conflict of interest stemming from his role as Gibson's campaign manager that violated petitioner's Sixth Amendment rights. The *per se* standard (which presumes prejudice) and the *Cuyler* standard (which creates only a limited presumption of prejudice) are simply two different legal standards that in this case are being applied to the same claim—that LaSaine's political relationship with Gibson resulted in a conflict of interest which violated petitioner's Sixth Amendment rights. The arguments made by petitioner differed only because the two jurisdictions (Illinois and the Seventh Circuit) have different legal standards for conflict of interest claims, and petitioner has tailored his arguments in state and federal court to reflect this difference.

1314

Petitioner should not be penalized by the fact that the Illinois Supreme Court and this Court differ on the proper legal standard to use to adjudicate a conflict of interest claim. As noted above, Illinois courts apply the *per se* standard to conflict of interest claims other than those involving multiple representation, whereas this Court and several of our sister circuits apply the *Cuyler* standard to any type of conflict of interest claim. Respondent would have petitioner argue in Illinois state court that the higher *Cuyler* standard should apply to his conflict of interest claim, which would put petitioner in the anomalous position of urging the Illinois courts to adopt a standard for adjudicating a conflict of interest claim that is less favorable to petitioner than Illinois' current view of the appropriate legal standard.

This Court's decisions in *United States ex rel. Tonaldi v. Elrod,* 782 F.2d 665 (7th Cir.1986) (*"Tonaldi II"*), and *United States ex rel. Tonaldi v. Elrod,* 716 F.2d 431 (7th Cir.1983) (*"Tonaldi I"*) are completely consistent with our reasoning today. Those cases merely recognize the fact that there can be two distinct ineffective assistance of counsel claims arising out of the same case. In *Tonaldi I* and *Tonaldi II,* we noted that a conflict of interest claim can be distinct from a claim that the attorney's decision to represent co-defendants was inconsistent with the minimum standards of competent representation. *Tonaldi I,* 716 F.2d at 436; *Tonaldi II,* 782 F.2d at 667. By contrast, in the instant case, petitioner at all times has pursued a single conflict of interest claim. The mere fact that two different jurisdictions apply different legal standards to the same conflict of interest claim does not make a single conflict of interest claim suddenly become two claims.

Even if petitioner's conduct was somehow construed as constituting a procedural default, the policies behind the doctrine that such a default bars federal habeas relief, see *Wainright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), mandate that petitioner's conflict of interest claim under the *Cuyler* standard be heard

by this Court. We have previously noted that the policy behind this doctrine is to ensure "that the defendant in a state criminal trial gives the state courts a fair chance to correct any federal constitutional errors before he asks the federal courts to nullify his conviction." *Phillips v. Lane,* 787 F.2d 208, 211 (7th Cir.1986). In the instant case, by raising his conflict claim and arguing the *per se* standard in the Illinois courts, petitioner has given the state courts a full chance to correct any federal constitutional errors. Since Illinois courts apply the *per se* standard to conflict claims of the type raised by petitioner, the Illinois courts would not have had any greater chance to correct constitutional errors if petitioner had argued his claim in terms of the *Cuyler* standard. The concerns of sandbagging and deliberate by-pass, see *Sykes,* 433 U.S. at 89, 97 S.Ct. at 2507, cited by *Tonaldi II,* 782 F.2d at 668, are not triggered by petitioner's failure to argue the *Cuyler* standard in a jurisdiction that does not apply that standard for the type of claim raised by petitioner. The district court was therefore free to address the merits of petitioner's claim under the *Cuyler* standard. We proceed to do the same.

III

Before evaluating the substance of petitioner's conflict of interest claim, we must determine if petitioner effectively waived this right at trial. During oral argument, respondent conceded, and we agree, that if the district court was correct to find that LaSaine, Gibson, and Bonacum colluded to secure LaSaine as petitioner's attorney, then petitioner's waiver was ineffective since he could not waive that of which he had no knowledge. See *United States v. Levine,* 794 F.2d 1203, 1206 (7th Cir.1986) (petitioner must be aware of the conflict in order to effectively waive it). Instead, respondent attacks the district court's finding that there was collusion. Respondent contends that Brandt's testimony, which formed the basis of the district court's finding of collusion, was not sufficient to overcome the presumption un-

der 28 U.S.C. § 2254(d) accorded to the state court's "implicit" finding that there was no such collusion.

The findings made by the state court are not entitled to a presumption of correctness under 28 U.S.C. § 2254(d) for several reasons. First, the determination of the validity of petitioner's waiver is not a purely factual question, but is rather a mixed question of law and fact. *Nash v. Israel*, 707 F.2d 298, 301 (7th Cir.1983). Second, certain material facts relating to the existence of collusion among LaSaine, Gibson, and Bonacum were not adequately developed at the hearing in state court. Patricia Brandt, LaSaine's secretary, never testified in any state proceeding, and her knowledge of several crucial facts was discovered only just before the habeas evidentiary hearing conducted by the district court. These circumstances substantially undercut any presumption of correctness owed to the state court's findings on this issue. See 28 U.S.C. § 2254(d)(3).

■ The district court's determination to credit Brandt's testimony and conclusion that collusion did occur was not clearly erroneous. Although Brandt left LaSaine's employ as a result of a disagreement she had with LaSaine over unemployment compensation insurance, there is no evidence that Brandt had a sufficient motive to commit perjury. Unlike Gibson and LaSaine, Brandt lacked any direct personal stake in the outcome of the instant case. Moreover, Brandt's testimony fits in well with the testimony of other witnesses. Wholly apart from Brandt's testimony, it is established that LaSaine was Gibson's campaign manager, that Gibson's campaign was based upon a strong law and order theme, that they had previously publicized a murder trial in which Gibson had sought the death penalty, that Bonacum approached Duncan, criticized Norval Hodges, and urged him to go see LaSaine again about his representing petitioner, and that LaSaine subsequently lowered his fee from $7,500 to $3,500. All of these facts are, at the very least, consistent with a finding that LaSaine, Gibson, and Bonacum worked together to entice petitioner's family to hire LaSaine as petitioner's defense counsel. When Brandt's testimony is added to these separately established facts, the evidence in total strongly supports a finding of collusion among LaSaine, Gibson, and Bonacum. Accepting this finding, respondent concedes that petitioner's waiver at trial of his conflict of interest claim was not valid.

## IV

■ Turning to the merits of petitioner's claim, under the *Cuyler* standard, petitioner must show that there was an actual conflict of interest which adversely affected LaSaine's performance at trial. The district court, after finding that collusion occurred prior to trial, determined that an actual conflict of interest between Gibson and LaSaine existed throughout LaSaine's representation of petitioner. The court further determined that this actual conflict of interest adversely affected LaSaine's performance at trial. The court noted that even though LaSaine entered his appearance as petitioner's attorney on May 19, 1980, and the trial began on May 27, 1980, LaSaine did not seek a continuance. The court also noted that LaSaine failed to interview the State's witnesses, and that his cross examination of these witnesses at trial was rather limited. The court relied on all of this as well as other aspects of LaSaine's representation of petitioner in concluding that this representation was adversely affected by LaSaine's conflict of interest. Respondent does not disagree with this analysis; rather, respondent contends that the court could not reach this conclusion without a finding of collusion. But since this Court has already determined that the district court's finding of collusion was not clearly erroneous, we must affirm the district court's conclusion that petitioner has met the *Cuyler* standard.

For the reasons set forth above, the decision of the district court is affirmed.