**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Feilberto FLORES, Angel L. Fontanez
and Amador Rodriguez, Defendants–
Appellants.**

**Feilberto FLORES, and Amador
Rodriguez, Petitioners–
Appellants,**

v.

**UNITED STATES of America,
Respondent–Appellee.**

Nos. 91–1839, 91–1854, 92–2007,
92–1203 and 92–1204.

United States Court of Appeals,
Seventh Circuit.

Argued April 28, 1993.

Decided Sept. 23, 1993.

Patrick J. King, Jr., Sean B. Martin, Asst. U.S. Atty., Crim. Div., Barry R. Elden, Asst. U.S. Atty., Crim. Receiving, Appellate Div., Joseph D. Heyd, Chicago, IL, for U.S.

Allan A. Ackerman (argued), David J. Peilet, Chicago, IL, for Feilberto Flores.

Patrick A. Tuite, Brent D. Stratton (argued), Chicago, IL, for Angel L. Fontanez.

Allan A. Ackerman (argued), Glenn Seiden, Seiden & Associates, Chicago, IL, for Amador Rodriguez.

Before BAUER, Chief Judge, COFFEY, Circuit Judge, and EISELE, Senior District Judge.[1]

BAUER, Chief Judge.

Feilberto Flores, Angel L. Fontanez, and Amador Rodriguez ("defendants") are three forcibly retired entrepreneurs. Like many successful entrepreneurs, they ran a well-organized commercial enterprise and made a substantial profit.[2] There was however, a difference in their business from the American norm. They applied their money-making skills to marketing, distributing, and selling an illegal product: cocaine, lots of cocaine. Eventually, Flores, Fontanez, and Rodriguez were forced into "retirement." All three were indicted, tried, and convicted of crimes. Flores was convicted of one count of conspiring to distribute cocaine, three counts of illegally using a communication facility to facilitate drug trafficking, and two counts of possession with the intent to distribute cocaine in violation of 21 U.S.C. §§ 846, 843(b), and 841(a)(1) respectively. Fontanez was convicted of one count of conspiring to distribute drugs and two counts of possession with the intent to distribute drugs in violation of 21 U.S.C. §§ 846 and 841(a). Finally, Rodriguez was convicted of conspiring to distribute cocaine in violation of 21 U.S.C. § 846. Flores was sentenced to 364 months in prison, Fontanez was sentenced to 264 months, and Rodriguez was sentenced to life without parole. The district court also fined Flores and Rodriguez $25,000 each. In this consolidated appeal, all three challenge their convictions and sentences. Additionally, Flores and Rodriguez petition for relief pursuant to 28 U.S.C. § 2255 ("section 2255") for alleged constitutional violations surrounding their convictions. We affirm their convictions and sentences, and deny Flores and Rodriguez section 2255 relief.

## I. Facts

The facts of this case read like a poor take-off of a James Bond movie. This sordid tale includes such clever gadgets as hidden, electronically-controlled drug compartments custom-built into cars, beepers, mobile telephones, and hidden electronic transmitters and tape-recorders. Also a part of this criminal story were code words used to disguise references to narcotics during telephone conversations, and a stash apartment, a place that contained little else but a stockpile of narcotics and items used to package and distribute narcotics.

From the summer of 1988 until their arrests in October 1990, Flores and Rodriguez engaged in a cocaine operation that was responsible for moving at least 1500 kilograms of cocaine on the streets of Chicago. At their trials, cohort Carlos Cabral testified for the prosecution. Cabral's drug-dealing activities with Flores and Rodriguez stretched back to at least the summer of 1988. During those initial deals, Flores and Rodriguez each received multiple kilograms of cocaine from Cabral for which they paid him substantial amounts of money. Over the next two years, Flores and Rodriguez dealt drugs with Cabral hundreds of times. Eventually, their roles switched as Flores and Rodriguez began supplying drugs to Cabral who then would sell the drugs on their behalf.

By the summer of 1990, Fontanez had joined the operation. Cabral testified that Fontanez worked with Flores in dealing kilogram quantities of cocaine. Cabral said that he first saw Fontanez in the summer of 1990, when Fontanez accompanied Flores to a meeting with Cabral. Cabral stated that at this meeting he handed a kilogram of cocaine to Fontanez. Cabral also testified that Fontanez was present at drug transactions involving Flores or Rodriguez and Cabral on four or five occasions between the summer of 1990 and October 1990. In a meeting with Cabral in October 1990, Rodriguez described Fontanez as a "trusted worker" who had

---

1. The Honorable Garnett Thomas Eisele, Senior Judge of the United States District Court for the Eastern District of Arkansas, is sitting by designation.

2. In fact, theirs was a family business of sorts. Rodriguez and Flores are half-brothers and Fontanez is married to their younger sister.

been working with Flores and him for a long time.

Cabral testified to eleven specific cocaine transactions by Flores, Fontanez, and Rodriguez during the three months preceding their arrest. Each delivery consisted of six to thirteen kilograms of cocaine.[3] Cabral would take the cocaine, sell what he could, then return any unsold amounts along with payment for the sold cocaine. On October 1, 1990, FBI agents picked up Cabral while he was trying to sell cocaine that he had received from Flores. Cabral told the FBI agents about his narcotics dealings with Flores, Fontanez, and Rodriguez and directed the agents to a hidden compartment in his car that contained four kilograms of cocaine. The agents also recovered $71,500 in cash from Cabral's car, and another $79,000 from Cabral's residence. The four kilograms of cocaine and the cash were on their way back to Flores.

Over the next few days, Cabral recorded telephone conversations with and led FBI agents to his cocaine customers. The FBI seized additional money and cocaine from those individuals. Cabral also had several tape-recorded conversations with Flores, and one with Rodriguez, regarding the distribution and sale of cocaine. During these conversations, which were played and explained to the juries, Flores and Rodriguez used code words to mask references to their illegal activities. For example, they referred to cocaine as "cars" and "roast pork." Flores made arrangements with Cabral for the return of the money and unsold cocaine (the same money and cocaine seized by the FBI at Cabral's arrest). Both Flores and Rodriguez talked to Cabral about the distribution of the next shipment of cocaine, which was to take place a few days later.

Flores and Cabral scheduled a meeting for the evening of October 4, 1990. Cabral reported to Flores that he had six "cars" to return to Flores. Flores set the meeting for

6:30 p.m. at a 7–11 store and explained that he was "waiting for my worker," which Cabral understood as Angel Fontanez.

To prepare Cabral for the meeting, FBI agents placed six kilograms of cocaine in the trunk of Cabral's car and placed two boxes full of paper strips (to pass for money that Cabral owed Flores for the other seven kilograms) in Cabral's back seat. The agents also provided Cabral with an electronic transmitter and a recording device so that they could monitor and record the meeting. Prior to Cabral's arrival at the 7–11, other FBI agents stationed in the area noticed two cars following each other very closely, a gray Lincoln and a tan Buick Riviera with dealer plates. The cars drove past the 7–11 and turned down a nearby alley. Earlier that day, the agents had spotted the same Lincoln at a car lot owned by Flores and at which Rodriguez worked.

When Cabral arrived at the 7–11, he did not see Flores, so he called him. Shortly after this call, Fontanez approached Cabral's car on foot and climbed into the front seat. Fontanez and Cabral had a brief conversation about the cocaine and money that Fontanez was to receive. Fontanez retrieved the boxes of fake money from the back seat while Cabral took out the six kilograms of cocaine from the trunk. Fontanez told Cabral that Flores had not allowed him to use a car to pick up the drugs and the money. Fontanez then took the packages in his arms, walked across the street, stopped briefly at a nearby bench, and rearranged his load before heading down an alley.

FBI agents followed Fontanez. FBI Special Agent Scott Jensen yelled to Fontanez as he was entering a second-floor apartment by way of a rear, exterior staircase. Jensen ran up the staircase in pursuit of Fontanez. When he reached the second floor landing, Jensen looked into the door of the apartment and spotted the packages containing the co-

---

**3.** Rodriguez made two deliveries at a garage on Montrose Avenue, one for eight kilograms and one for twelve kilograms, for which Cabral paid him $27,000 per kilogram. Flores and Fontanez made two deliveries of between eight and ten kilograms each at Touhy Avenue and the Edens Expressway. Flores made two deliveries at Cice-

ro and Peterson streets for six and eight kilograms respectively. Flores and Rodriguez made two eight kilogram deliveries to a garage at Lawndale and Argyle streets. Finally, there were three deliveries by Flores and Fontanez to a 7–11 store at Montrose and Marmora streets of six to thirteen kilograms of cocaine at each delivery.

caine and fake money on the kitchen counter. Jensen called out to Fontanez and said that he wished to speak to him, at which point Jensen noticed a second person—Flores. Jensen then identified himself as an FBI agent, entered the apartment, and ordered Fontanez and Flores to get down on the floor.

After arresting Flores and Fontanez, the FBI agents conducted a protective sweep to make sure that no one else was in the apartment. With the area secured, the agents obtained and executed a search warrant for the apartment. In their search of the apartment, which had been rented by Fontanez since February 1990, the agents found the six kilograms of cocaine that Fontanez had just brought in with him, approximately 1.5 additional kilograms of cocaine, and 158.77 grams of heroin. In one of the bedrooms of the apartment, the agents found three packages of cocaine under the bed, two plastic baggies filled with cocaine underneath a small dresser, and an Ohaus triple-beam scale, the type of scale often used to weigh narcotics. In the dresser, the agents discovered a large stash of empty plastic baggies of the kind commonly used to package and distribute narcotics. They also found a handwritten note that contained numbers which indicated the conversion from grams to ounces. In the kitchen, the agents found more boxes of plastic baggies, the six kilograms of cocaine that Fontanez brought in with him, and no food, other than a bottle of champagne and half a wedding cake in the refrigerator. From the dining room table at which Flores had been sitting when Jensen first looked in the apartment, the agents recovered a large wad of cash, a mobile telephone, and a set of keys that fit a tan Buick Riviera that was parked out front of the apartment building. The tan Buick was one of Flores' four cars into which Cabral had installed a hidden, electronically controlled secret compartment, and was the same car the surveillance agents had seen driving by the 7-11 just before the Cabral–Fontanez meeting. In the other bedroom of the apartment, the agents' found a small, empty box marked "Ohaus" and other boxes that contained documents with Amador Rodriguez's name and, in some cases, signature. These documents included car titles, other official documents, and letters. The agents also seized $5,400 in cash from Flores' pocket.

On October 5, 1990, the day after the arrest of Flores and Fontanez, Rodriguez contacted Cabral.[4] In tape-recorded conversations, Rodriguez expressed his anxiety at the arrest of Fontanez and Flores, as well as his desire to meet with Cabral immediately. Rodriguez told Cabral to be "all showered and very clean" for their meeting. These code words meant that Cabral should bring no drugs with him.

Cabral met with Rodriguez later that day. FBI agents watched that meeting and monitored an electronic transmitter worn by Cabral during the meeting. Rodriguez began by expressing his suspicion that Cabral was working with the government, and told Cabral that he would soon learn from Flores' lawyers if that were so. In a wily strategic maneuver, Cabral suggested that Fontanez might be the informant. Rodriguez rejected that suggestion and explained that Fontanez had been a trusted worker for a long time. Inexplicably, Rodriguez repeated his suspicions, but then threw caution to the wind and carried on as if Cabral posed no threat to his criminal enterprise. Rodriguez refocused his attention on matters he obviously viewed as more important: the current status of his cocaine business. He did this by talking to Cabral about the distribution of a 25–kilogram shipment of cocaine. Like any other commercial enterprise that has lost the services of two highly-valued workers (here, Flores and Fontanez), Rodriguez had to rely on those who, like Cabral, were still able to contribute their labor to the business. Rodriguez explained that if Flores' lawyers said that Cabral was "okay," the two of them would work together in distributing the 25 kilograms. Cabral and Rodriguez spoke by phone the next day, October 6, 1990, and discussed the details of Flores' and Fontanez's arrest.

---

4. Only the jury in the Rodriguez trial heard evidence of contacts between Rodriguez and Cabral after Flores and Fontanez were arrested.

The government presented other evidence at the two trials conducted in this case, including telephone records that demonstrated extensive contact between and among Cabral, Flores, Fontanez, and Rodriguez during September and October 1990. The government produced evidence of calls to and from Flores' mobile phone, Rodriguez's mobile phone, and the phone at Flores' car dealership. Also, the government introduced evidence that Fontanez had a beeper listed in his name. This beeper was operational at least as early as September 19, 1990.

Flores and Fontanez were tried together. Rodriguez was tried separately. All three were found guilty and sentenced. All three appeal.

## II.

Flores, Rodriguez, and Fontanez raise several issues on appeal. None impel a reversal.

### A. Conflict of Interest of Trial Counsel

Flores, Rodriguez, and Fontanez all claim that their right to conflict-free trial counsel was violated. Rodriguez and Flores—as their enhanced sentences reveal—have a long history of criminal activity that precedes their cocaine distribution business in this case. Each needed lawyers to represent them in their prior run-ins with the law. In this case, they needed lawyers again. So, like sick patients who call up longtime family doctors, they contacted attorneys who had represented them before. Potential conflict of interest problems developed, however, as the three defendants and their attorneys played a virtual musical chairs game of attorney-client relationships. The lawyers chosen to represent Flores and Fontanez, respectively Michael Green and Roberta Samotny, represented Rodriguez in prior, unrelated criminal proceedings. Further, Rodriguez's

counsel, Glenn Seiden, initially represented Fontanez in the current case then switched to Rodriguez. The government asked the district court to disqualify all three lawyers because of alleged actual and potential conflicts of interest. The court held a hearing on the matter pursuant to Federal Rule of Criminal Procedure 44(c).[5]

At the hearing, the district court asked the defendants and their respective attorneys about the alleged conflicts. The court questioned each attorney to make sure he or she had explained the problem to their respective clients. The court then asked each defendant if he wanted to continue with his current counsel. The court's questioning of Flores went as follows:

> THE COURT: I want you to understand that under the Constitution, you have the right to have an attorney that represents your own personal best interests, nobody else's. Do you understand that?
>
> MR. FLORES: Yes, yes.
>
> THE COURT: And my concern is that your present attorney, having represented Mr. Rodriguez, that you understand that it is your best interests you must consider and your attorney must consider and not Mr. Rodriguez's best interests. His attorney must consider his best interests, and I want you to understand that fully.
>
> And I'd like to mention to you some of the potential—and I don't know that this would ever happen, but I want you to understand why I'm concerned. In the event Mr. Rodriguez decided to take the witness stand and cooperate with the government and testify against you, your attorney might be in the position of cross-examining somebody he once had an attorney-client relationship with. And that presents two types of problems. One is will he zealously and conscientiously represent your interests against his former

5. Rule 44(c) states in full:
 (c) **Joint Representation.** Whenever two or more defendants have been jointly charged pursuant to Rule 8(b) or have been joined for trial pursuant to Rule 13, and are represented by the same retained or assigned counsel or by retained or assigned counsel who are associated in the practice of law, the court shall promptly inquire with respect to such joint representation and shall personally advise each defendant of the right to the effective assistance of counsel, including separate representation. Unless it appears that there is good cause to believe no conflict of interest is likely to arise, the court shall take such measures as may be appropriate to protect each defendant's right to counsel.
 Fed.R.Crim.P. 44(c).

client's interests; or, on the other hand, from Mr. Rodriguez's point of view, will he, because he knows Mr. Rodriguez, be at an unfair advantage because of that prior relationship.

So I want you to be aware of this situation. Have you thought about, under these circumstances, have you though about whether you wish Mr. Green to continue representing you in this case?

MR. GREEN: She's asking if you've thought about whether you want me to continue being your lawyer. You have to answer her.

MR. FLORES: Yes, your Honor.

THE COURT: ... [Y]ou must be free to get the kind of objective legal advice on [the issue of cooperation with the government] if you're at all concerned or wish to consider any advantage to you.... That's another matter that you should consider in deciding whether or not you wish Mr. Green to represent you. Do you understand what I'm talking about?

MR. FLORES: Yes, your Honor.

THE COURT: Does it make sense to you? All right. Well, having considered these matters, what do you wish to do?

MR. GREEN: Do you want me to be your lawyer or not?

MR. FLORES: Yes, I would like him.

THE COURT: You wish to continue with Mr. Green's representation?

MR. FLORES: Yes, your Honor.

January 31, 1991 Transcript at 13–15. Next, the court questioned Samotny and Fontanez. That exchange went as follows:

THE COURT: All right. Mr. Fontanez—well, let me ask you, Miss Samotny. Have you gone over with Mr. Fontanez his right to counsel and the implications involved in that?

MS. SAMOTNY: Certainly I have, Judge.

THE COURT: And Mr. Flores, I myself—I'm sorry, Mr. Fontanez, I myself must advise you of your right to counsel, and that means an attorney who will act in your own personal best interests and no one else's. Do you understand what I'm saying?

MR. FONTANEZ: Yes.

THE COURT: ... I want you to understand that your attorney and your relationship is a confidential matter. It's not something I want to get into in terms of anything said between you, but I want you to also understand that the person who represents you must represent only you and do what would be best for you, particularly in view of the fact you have no prior felony conviction, that you may wish to testify on your own behalf because you have no prior felony conviction, and it might be in your best interests to do so. I don't know what the facts that go into that decision are in this case, but it might be in your best interest. It might be in your best interest to cooperate with the government because it might, in effect, reduce your potential sentence. Are you aware of these things?

MR. FONTANEZ: Yes, I do.

THE COURT: And have you given some thought as to whether or not you wish Miss Samotny to continue representing you in this case?

MR. FONTANEZ: Yes, I would like for her to represent me.

THE COURT: All right. Thank you.

*Id.* at 19–21. Finally, the court questioned Seiden and Rodriguez:

THE COURT: Have you advised Mr. Rodriguez about the potential problem of your having appeared on behalf of Mr. Fontanez?

MR. SEIDEN: Prior to the 44(c) motion we received the day before yesterday, I've had individual—I found it necessary to have individual, of course, individual meetings with my client wherein I had to advise him that I was interested in him, only him, and that we would not be meeting with attorneys or other family members. Yes, we have discussed this in some detail, Judge.

THE COURT: All right. I would like to address Mr. Rodriguez directly—

MR. SEIDEN: Please.

THE COURT: —on this issue.

Mr. Rodriguez, I wish to tell you that under the Constitution of the United

States, you have the right to have a lawyer represent you that represents you, only you, in your own personal best interests. Do you understand that?

MR. RODRIGUEZ: (Through interpreter:) Yes.

THE COURT: Do you understand that you must make your own decisions in this case with the assistance of an attorney—

MR. RODRIGUEZ: (Through interpreter:) Yes.

THE COURT: —who will consider your interests, rather than those of your co-defendants? Even though they're family members, and I understand you're concerned what happens to your family, your attorney must be your own loyal spokesman here in the court and no one else's. Do you understand that?

MR. RODRIGUEZ: (Through interpreter:) Yes, yes.

THE COURT: Have you thought about this matter?

MR. RODRIGUEZ: (Through interpreter:) Yes.

THE COURT: What do you wish to do?

THE COURT: Do you wish Mr. Seiden to continue to represent you in this matter?

MR. RODRIGUEZ: (Through interpreter:) Yes.

THE COURT: All right, thank you.

*Id.* at 25–26. The district court respected the expressed preferences of each defendant and declined the government's invitation to intrude into the defendant's counsel of choice. *Id.* at 32. The court concluded that a severance was the best way to deal with the situation and therefore scheduled a separate trial for Rodriguez. *Id.*

On appeal, the government claims that Flores, Fontanez, and Rodriguez waived their right to conflict-free counsel by their answers at the Rule 44(c) hearing. The defendants counter by arguing that the district court should not have accepted their waivers because their waivers were not knowingly or intelligently made. They charge that the district court failed to make a detailed inqui-

ry into how the conflict of interest might relate to the individual defendants and note that the defendants' answers were usually only one or two words. These arguments lack merit.

■ First of all, there is no requirement that the district court follow some pre-ordained, detailed script when eliciting a criminal defendant's waiver of the Sixth Amendment right to conflict-free counsel.[6] *United States v. Roth*, 860 F.2d 1382, 1387–88 (7th Cir.1988), *cert. denied*, 490 U.S. 1080, 109 S.Ct. 2099, 104 L.Ed.2d 661 (1989). We do not ask whether a defendant's decision to waive is foolish. Rather, we ask only whether the defendant made an informed decision. A waiver is sufficient if it was made knowingly and intelligently, that is to say, if it was made with sufficient awareness of the relevant circumstances and likely consequences. *United States v. Lowry*, 971 F.2d 55, 60 (7th Cir.1992). The district court need not conduct a long-winded dialogue with counsel and defendants when inquiring about a waiver. *Roth*, 860 F.2d at 1389. It is enough that the district court inform each defendant of the nature and importance of the right to conflict-free counsel and ensure that the defendant understands something of the consequences of a conflict. *Id.* at 1388.

■ The district court in this case satisfied these standards. The transcript of the Rule 44(c) hearing reveals that the district court carefully questioned each attorney and each defendant about potential and actual conflicts created by the prior representation of co-defendants. After the district court explained the right to conflict-free counsel, each defendant made clear that he wanted to stick with his current attorney.

■ We note that the district court must recognize a presumption in favor of a defendant's counsel of choice. *Wheat v. United States*, 486 U.S. 153, 164, 108 S.Ct. 1692, 1699, 100 L.Ed.2d (1988). The district court, with this presumption in mind, chose to respect the decision of the defendants. We do

---

**6.** The Sixth Amendment provides, in pertinent part, that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." U.S. Const. amend. VI.

the same. Flores, Fontanez, and Rodriguez, made their decision to waive their right to conflict-free counsel before the district court and cannot now reverse course.

■ The defendants' other argument—that their waivers are not valid because most of their answers at the Rule 44(c) hearing consisted of only one or two words—is also without merit. In *United States v. Kladouris*, 964 F.2d 658 (7th Cir.1992), the criminal defendant waived her right to conflict-free counsel by answering the district court with such brief answers as: "Yes, sir.;" "Yes, sir.;" "No, I don't, because I'm not.;" "Yes, sir.;" and "No." *Id.* at 666–667. We affirmed the district court's decision that such a waiver was valid and affirmed the defendant's conviction. Similarly, we affirm here. The defendants answers at the Rule 44(c) hearing adequately expressed their preferences.[7] We respect the defendants' choice of trial counsel and hold that the defendants waived their Sixth Amendment right to conflict-free counsel.

### B. Section 2255 Petition of Flores and Rodriguez

While their direct appeals were pending, Flores and Rodriguez filed collateral attacks in the district court pursuant to section 2255. The district court denied relief. In their section 2255 petition, Flores and Rodriguez repeat their argument that their waivers of conflict-free counsel were neither knowing nor voluntary, but for different reasons than they gave before. They claim that their answers to the district court's questions at the Rule 44(c) hearing were prompted by their lawyers. Flores argues additionally that he was denied his Sixth Amendment right to counsel because his attorney was more interested in a civil case that was then pending in Hawaii.

We begin our analysis of this claim by noting that the grounds for relief under section 2255 are very narrow. *Basile v. United States*, 999 F.2d 274 (7th Cir.1993). Flores and Rodriguez can recover if they can show that their Sixth Amendment right to the effective assistance of counsel was violated.

■ Their argument on this ground fails for two reasons. First, their contention that their answers were prompted by their attorney is not supported by the record. Affidavits submitted by their attorneys before the district court refute their claim. The district court concluded—and we agree—that these claims are merely post-hoc rationalizations put forth by Flores and Rodriguez to persuade the district court to vacate their convictions. Flores and Rodriguez waived their right to conflict-free counsel in open court, of their own free will. We refuse to say that merely by alleging—with no other support— that their waivers were "prompted" by their attorney entitles them to a hearing on the issue. This is exactly the kind of whipsawing that the Supreme Court has explicitly cautioned against. *Wheat*, 486 U.S. at 161, 108 S.Ct. at 1698. Flores and Rodriguez have failed in their attempt to persuade us that their waivers were invalid.

■ The only other section 2255 issue is whether Flores has sufficiently alleged a Sixth Amendment ineffective assistance of counsel claim against Green because Green allegedly placed greater emphasis on his work in another client's civil case then pending in Hawaii than he did on Flores' criminal case.[8] To state a valid claim for ineffective assistance of counsel, Flores first had to show that Green's performance was deficient. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); *United States ex rel. Duncan v. O'Leary*, 806 F.2d 1307, 1312 (7th Cir.1986), *cert. denied*, 481 U.S. 1041, 107 S.Ct. 1982, 95 L.Ed.2d 822 (1987). Second, Flores had to show that Green's deficient performance prejudiced his defense. This second prong requires a showing that Green's errors were so serious as to deprive Flores of a fair trial, that is, of a trial

---

**7.** We note as an additional matter that by severing Rodriguez's trial, the district court adequately disposed of any conflict of interest that might have occurred if all the defendants had been tried together.

**8.** By waiving his right to conflict-free counsel, Flores waived only his right to effective assistance of counsel as it relates to any conflict of interest issues. *Lowry*, 971 F.2d at 63. Flores did not waive any other ineffective assistance of counsel claim.

whose result is reliable. *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064; *O'Leary*, 806 F.2d at 1312. To succeed, Flores is required to make both showings. *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064. He has made neither.

To begin with, Flores presents nothing that suggests that Green's performance was deficient. Flores points to nothing Green should have or could have done that Green did not do and therefore fails to rebut our presumption that Green effectively assisted Flores. *Biggerstaff v. Clark*, 999 F.2d 1153 (7th Cir.1993). The abundant evidence against Flores also establishes that the result of the trial—Flores' conviction—was reliable.

Flores' allegation that Green placed more emphasis on a Hawaiian civil case than on Flores' criminal case adds nothing. All attorneys must make decisions about how to allocate their scarce lawyerly resources among the many clients they may represent at any given time. Evaluating such decisions is not within the province of this court. We ask only whether a lawyer—here, Green—performed adequately in *this* case. Our review of the record indicates that Green's performance was more than adequate and easily satisfies the requirements of the Sixth Amendment.

Both Flores and Rodriguez have failed to state a valid claim for relief pursuant to section 2255. Accordingly, we affirm the district court's decision to deny their section 2255 petitions.

## C. Evidentiary Challenge by Rodriguez

Rodriguez argues that the district court erred when it allowed Cabral to testify that the cocaine distribution conspiracy extended as far back in time as 1988. He claims that

such testimony was admitted in violation of Federal Rules of Evidence 403 and 404(b).[9]

 We review a district court's evidentiary rulings for abuse of discretion. *United States v. Smith*, 995 F.2d 662 (7th Cir. May 3, 1993). The test for admissibility of past act evidence under Rules 403 and 404(b) is whether:

(1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged, (2) the evidence shows that the other act is similar enough and close enough in time to be relevant to the matter in issue, (3) the evidence is sufficient to support a jury finding that the defendant committed the similar act, and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice.

*United States v. Shields*, 999 F.2d 1090 (7th Cir.1993) (citation omitted). Cabral's testimony in this case satisfies all four parts of this test. First, Rodriguez's membership in the cocaine distribution conspiracy was a matter in issue. Cabral's testimony establishes that Rodriguez was a part of the on-going criminal conspiracy since at least 1988. Cabral's testimony did not relate to Rodriguez's propensity to distribute cocaine as a general matter. Second, Cabral's testimony, which reaches back some two years before the FBI arrested Rodriguez, is easily close enough in time to be relevant to events charged in this case. *See Smith*, 995 F.2d at 672 (evidence properly admitted where two years separated the prior act and the charged acts); *United States v. Goodapple*, 958 F.2d 1402, 1407 (7th Cir.1992) (evidence of transaction five years prior to those charged properly admitted). Third, Cabral's testimony supports a jury finding that Rodri-

---

9. Rule 403 provides:
 Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.
 F.R.Evid. 403. Rule 404(b) states as follows:
 **(b) Other crimes, wrongs, or acts.** Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity there-

with. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.
 F.R.Evid. 404(b).

guez conspired to distribute cocaine since 1988. Finally, the probative value of Cabral's testimony is not substantially outweighed by any danger of unfair prejudice. The district court properly admitted Cabral's testimony about Rodriguez's pre-indictment involvement in the cocaine distribution conspiracy.

## D. Challenge to Sentencing by Flores and Rodriguez

Flores and Rodriguez claim that the district court did not follow the appropriate procedures when it sentenced them. Specifically, they contend that the district court improperly enhanced their sentences without complying with the requirements of 21 U.S.C. § 851(b).[10] That statute sets forth the requirements that the government, the criminal defendant, and the district court must follow when the government seeks to enhance the defendant's sentence because of prior convictions. Section 851(a) requires the government to file an information with the court before trial which "states in writing the previous convictions to be relied upon." 21 U.S.C. § 851(a)(1). If the government complies, as it did in this case, section 851(b) directs the district court, before pronouncement of sentence, to ask the defendant whether the defendant affirms or denies that alleged prior conviction. Rodriguez and Flores argue—quite accurately—that the district court did not comply with this requirement. No matter, Rodriguez and Flores' argument still fails.

■ Flores' argument fails because he was sentenced under the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G"). Section 851 applies to persons convicted of an offense under Title 21 "when the government seeks to enhance the maximum penalty under the recidivist provisions of that statute. The statute does not apply, however, when sentencing is conducted under the Sentencing Guidelines and the defendant receives an increased sentence which is within the statutory range." *United States v. Belanger*, 970 F.2d 416, 417 n. 1 (7th Cir.1992) (citations omitted). The maximum penalty prescribed for a violation of two of the three statutes Flores was convicted of—sections 841(a)(1) and section 846—is life imprisonment.[11] Flores received a sentence of 364 months pursuant to the Guidelines. This sentence is within the statutory range. Therefore, the requirements of section 851 do not apply.

■ Rodriguez's section 851(b) argument fails as well, but for different reasons. The district court sentenced Rodriguez to life imprisonment and fined him $25,000 pursuant to 21 U.S.C. § 841(b)(1)(A).[12] Section 851's requirements apply, therefore, because Rodriguez was not sentenced pursuant to the Guidelines. The government's information reveals that Rodriguez's two prior convictions, for sentence enhancement purposes, are a 1976 Cook County, Illinois conviction for heroin delivery and a 1982 federal conviction in Puerto Rico for a drug conspiracy and

---

**10.** Section 851(b) states:

(b) If the United States attorney files an information under this section, the court shall after conviction but before pronouncement of sentence inquire of the person with respect to whom the information was filed whether he affirms or denies that he has been previously convicted as alleged in the information, and shall inform him that any challenge to a prior conviction which is not made before sentence is imposed may not thereafter be raised to attack the sentence.

21 U.S.C. § 851(b).

**11.** For example, section 841(b)(1)(A) states in relevant part:

**(1)(A)** In the case of a violation of subsection (a) of this section involving— ... (ii) 5 kilograms or more of a mixture or substance containing a detectable amount of— ... (II) co-

caine such person shall be sentenced to a term of imprisonment which may not be less than 10 years or more than life....

21 U.S.C. 841(b)(1)(A).

**12.** The relevant section of this statute, as far as Rodriguez's sentence is concerned, reads as follows:

If any person commits a violation of this subparagraph ... after two or more prior convictions for a felony drug offense have become final, such person shall be sentenced to a mandatory term of life imprisonment without release and fined in accordance with the preceding sentence.

21 U.S.C. § 841(b)(1)(A). The "preceding sentence" provides for fines of up to "$8,000,000 if the defendant is an individual or $20,000,000 if the defendant is other than an individual, or both." *Id.*

possession with intent to distribute five kilograms of cocaine.

Section 851(e) prohibits a defendant from challenging a conviction that is more than five years old.[13] A district court is not required to "adhere to the rituals of § 851(b) where a defendant, as a matter of law, is precluded from attacking the conviction forming the basis of the enhancement information." *United States v. Nanez*, 694 F.2d 405, 413 (5th Cir.1982), *cert. denied*, 461 U.S. 909, 103 S.Ct. 1884, 76 L.Ed.2d 813 (1983). *See also United States v. Fragoso*, 978 F.2d 896, 902 (5th Cir.1992) (trial court need not adhere to requirements of section 851(b) where conviction more than five years old), *cert. denied*, — U.S. ——, 113 S.Ct. 1664, 123 L.Ed.2d 282 (1993); *United States v. Housley*, 907 F.2d 920, 921–22 (9th Cir.1990) (same); *United States v. Weaver*, 905 F.2d 1466, 1482 (11th Cir.1990) (same), *cert. denied*, 498 U.S. 1091, 111 S.Ct. 972, 112 L.Ed.2d 1058 (1991). The government filed the information in this case on January 28, 1991. Rodriguez's two prior convictions occurred more than five years before that date. The requirements of section 851(b) do not apply.

### E. Responsibility of Fontanez for Sentencing Purposes

Fontanez contends that the district erroneously considered drug transactions for sentencing purposes that were not part of his conspiratorial agreement and therefore not reasonably foreseeable to him. Fontanez insists that he is responsible for only thirty-one kilograms of cocaine, not the full amount of all drug transactions identified at trial. He thus claims that his Base Offense Level un-

der the Guidelines should be 34, not 36 as the district court found.[14] The district court disagreed, found Fontanez liable for the full amount, and sentenced him accordingly. Direct evidence linked Fontanez to the thirty-four kilogram amount. Fontanez argues that any quantity above this was the result of transactions that were not a part of his conspiratorial agreement. His claim is that his conspiratorial agreement did not encompass any transaction where he was not present. The issue, then, is: what exactly was the extent of Fontanez's conspiratorial agreement?

This question does not produce an obvious answer. There is no written text that we can look to in order to discern the intent of the parties to the conspiratorial agreement. Cocaine conspirators do not ordinarily commit their mental agreements to written contracts. They tend to rely on informal oral contracts that are, by their very nature, difficult for district courts to reconstruct at sentencing.

■ Fortunately, the Guidelines provide a method for solving this problem. The Guidelines require district courts to sentence a criminal conspiracy defendant on the basis of all acts committed by the defendant for which the defendant "would be otherwise accountable." U.S.S.G. § 1B1.3. Application Note 1 defines conduct for which a defendant "would be otherwise accountable" as "conduct of others in furtherance of the execution of the jointly-undertaken criminal activity that was *reasonably foreseeable* by the defendant."[15] U.S.S.G. § 1B1.3, comment. (n. 1) (emphasis added).

---

13. Section 851(e) provides:
 (e) No person who stands convicted of an offense under this part may challenge the validity of any prior conviction alleged under this section which occurred more than five years before the date of the information alleging such prior conviction.
 21 U.S.C. § 851(e).

14. Fontanez was sentenced in April 4, 1991. Thus, the Guidelines applicable as of November 1, 1990 apply. Under those Guidelines, a Base Offense Level of 34 applies to defendants found liable for at least fifteen but less than fifty kilograms of cocaine. A Base Offense Level of 36 applies to defendants found liable for at least fifty

but less than 150 kilograms of cocaine. U.S.S.G. § 2D1.1(c)(5).

15. The commentary that interprets or explains a guideline is "authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." *Stinson v. United States*, — U.S. ——, ——, 113 S.Ct. 1913, 1915, 123 L.Ed.2d 598 (1993). There is nothing in Application Note 1 to U.S.S.G. § 1B1.3 that violates the Constitution or a federal statute or is inconsistent with, or a plainly erroneous reading of, that guideline. We therefore treat it as authoritative.

Reasonable · foreseeability refers to the scope of the agreement that Fontanez entered into when he joined the conspiracy, not merely to the drugs he may have known about. *United States v. Edwards,* 945 F.2d 1387, 1403 (7th Cir.1991), *cert. denied,* ── U.S. ──, 112 S.Ct. 1590, 118 L.Ed.2d 308 (1992). The district court noted the following evidence against Fontanez: (1) Rodriguez told Cabral the day after Fontanez was arrested that Fontanez was a long-time "trusted worker;" (2) the 120.4 kilogram quantity of cocaine, which the district court used, was a conservative amount, given Cabral's testimony; (3) Fontanez rented the stash apartment in February 1990; and (4) Cabral testified that Fontanez's involvement in the cocaine distribution operation began at least as early as the summer of 1990, well before the first of the eleven transactions which helped comprise the full 120.4 kilogram amount.[16] The district court applied the appropriate preponderance of the evidence standard, accepted these facts as established, and concluded that the full quantity of cocaine was reasonably foreseeable to Fontanez. *See United States v. Ruffin,* 997 F.2d 343 (7th Cir.1993) (articulating preponderance of the evidence standard for sentencing). We will reverse the district court's finding only if it is clearly erroneous. 18 U.S.C. § 3742(e); *United States v. Villarreal,* 977 F.2d 1077, 1080 (7th Cir.1992), *cert. denied,* ── U.S. ──, 113 S.Ct. 1350, 122 L.Ed.2d 731 (1993). It was not clearly erroneous.

Fontanez argues that the district court failed to conduct the kind of individualized inquiry that we described in *Edwards.* 945 F.2d at 1399. In *Edwards,* we discussed the reasonably foreseeable standard at some length and directed district judges, when applying this standard, to set forth the reasons why the particular amount of drugs was reasonably foreseeable to the criminal conspiracy defendant. *Id.*

The district court complied with *Edwards* when it sentenced Fontanez. At sentencing and after giving both Fontanez and Assistant United States Attorney Sean Martin an op-

portunity to make their case, the court concluded as follows:

THE COURT: I do find by a preponderance of the evidence that Mr. Fontanez was a knowledgeable conspirator with respect to the scope of the activities between Mr. Flores, Mr. Rodriguez, Mr. Cabral, at least as early as August 1990. He rented the apartment, which was in effect a drug house for this operation, I believe it was in February or March of that year; it was considerably earlier.

MR. MARTIN: February 1990, your Honor.

THE COURT: It was an apartment filled with very little besides baggies and a scale, as I recall, some drug records.

And given that kind of corroboration, plus Mr. Cabral's testimony, I think the record sufficiently supports a finding by a preponderance of the evidence that the full 120 kilos, which is a conservative government estimate, is relevant conduct to this offense. So therefore, I overrule the objection with respect to the base offense level of 36.

April 4, 1991 Sentencing Transcript at 9–10. This individualized inquiry by the district court satisfies *Edwards.* The district court's findings are not clearly erroneous. We affirm Fontanez's sentence.

### III.

The convictions and sentences of Flores, Rodriguez, and Fontanez are

AFFIRMED.

---

16. *See* note 3, *supra,* which sets out the eleven transactions that Cabral testified to.