**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Barry Kenneth STEVENSON, Ronald D. Vesper, and Gary B. Stevenson,
Defendants–Appellants.**

**Nos. 90–2082, 90–2092, 90–2125**

United States Court of Appeals,
Seventh Circuit.

Submitted June 12, 1991.

Decided Aug. 30, 1991.

As Amended Aug. 30, 1991.

Robert T. Coleman, Asst. U.S. Atty. (argued), Criminal Div., East St. Louis, Ill., for U.S.

James Hackett, Alton, Ill., for Barry K. Stevenson.

Renee E. Schooley, Federal Public Defender (argued), St. Louis, Mo., for Ronald D. Vesper.

John H. Rion, Dayton, Ohio, Suzanne Philbrick (argued), Chesterton, Ind., for Gary B. Stevenson.

Before BAUER, Chief Judge, EASTERBROOK, Circuit Judge, and FAIRCHILD, Senior Circuit Judge.

BAUER, Chief Judge.

It was a family affair. Brothers Tim, Rick, and Steve Pressel ran a multi-state marijuana ring and brothers Barry and Gary Stevenson were part of their operation. Our story begins in the early 1980s in Gainesville, Florida when David Pruett met up with a marijuana dealer named Bill Hale. Pruett left Florida to move to Atlanta. Soon after, Hale had Pruett and one Dan Simpson driving trunkloads of marijuana from Atlanta to Manhattan, Kansas. Hale moved to Colorado and invited Pruett to stay on the ranch where he was living. In late summer 1983, Hale introduced Pruett to the Pressel family at a barbecue at the ranch. More than meat was smoking at the party. There was a good deal of pot passed around that day.

The scene then shifted back to Florida, where Pruett had returned in May of 1984 to attend his mother's funeral. He took a job with a Daytona Beach suntan lotion company named Sun Solutions as its Colorado distributor. Pruett seemed to have a knack for attracting the wrong types: the owner of the Sun Solutions Colorado distributorship, Earl Bond, carried another product line: marijuana. Bond mentioned to Pruett that he wouldn't be able to continue in the suntan lotion business without an infusion of ready cash and suggested that he needed a new source of supply. Pruett thought of the Pressels and asked Tim Pressel to have his brothers call Pruett. Pruett and Bond flew to Dayton, Ohio to meet with Robert Steven and Richard Pressel ("Steve" and "Rick"). Dan Simpson went along. The assembled group agreed that the Pressels would deliver marijuana to Bond on a "front" basis, that is, Bond would not have to pay for it until it was sold. The deliveries were to be made to the St. Louis area, Bond's home base.

For making the introduction, Pruett would receive $5–$10 per pound as commission.

As agreed, the Pressel organization began making deliveries to Earl Bond, either in southern Illinois or St. Louis. The drivers usually were Rick, Barry Stevenson ("Barry"), Dan Simpson, and a fellow everyone knew as "Bill." They would bring Bond's marijuana to various locations in southern Illinois, such as Jack Wilhelm's residence, Ronald Vesper's trailer, and different hotels, so that an individual aptly named Fred Crook could pick it up for further distribution. Gary Stevenson ("Gary") supplied beepers, organized transportation of marijuana from Florida, and recruited another driver. Gary also turned over marijuana to other individuals for distribution in the Dayton area.

By February 1985, Bond was behind in his payments to the Pressels. Pruett was brought in to try to determine how much he had received, how much he owed, and why he was so delinquent on his payments. Pruett flew to St. Louis several times to try to get Bond to send the Pressels more money. Armed with records of deliveries and payments, Pruett registered at the Breckenridge Hotel near Bond's home in Chesterfield, Missouri, just outside of St. Louis. While he was in town, Pruett saw Barry Stevenson deliver a trunkload of pot to Bond in nearby Collinsville, Illinois.

Meanwhile, agents from the federal Drug Enforcement Administration Agency had placed the distribution network under surveillance. Pursuant to a search warrant, they entered Pruett's hotel room and seized approximately $130,000 in cash and records, including records of marijuana deliveries, money owed, telephone numbers, calculations, and calculator tapes. The agents found written notations of the beeper number by which Pruett could reach Steve and Rick Pressel and the beeper number by which the Pressels could reach Pruett. A further check revealed that the beepers had been leased to Colonial Builders, Gary Stevenson's company. Stevenson's contract with the pager company listed Rick as a subscriber. Pruett was detained briefly, but not arrested. He ended his association with the Pressels and continued to work for Sun Solutions. Dan Simpson and Bill Hale became Bond's suppliers; Bond and the Pressels did not deal directly with each other.

A little more than two years later, agents from the Great Lakes Organized Crime and Drug Enforcement Task Force obtained a warrant and searched Rick's house in Centerville, Ohio. There, they found a large amount of marijuana, drug paraphernalia, and various records documenting the use of automobiles to haul the marijuana. The agents also found records that matched the ones taken from Pruett at the Breckenridge. The seized records "named names" of those involved in the Pressel organization.

On August 24, 1989, a grand jury in the southern district of Illinois returned a fourteen-count indictment charging David Pruett, Daniel Simpson, Rick Pressel, Barry Stevenson, Gary Stevenson, Robert Steven "Steve" Pressel, James Meyer, Ronald Vesper, and Bill Last–Name–Unknown with conspiring to distribute more than fifty kilograms of marijuana during the period from approximately January 1, 1984 to December 31, 1987, in violation of 21 U.S.C. §§ 841(a)(1) and 846. With the exception of Vesper and Steve Pressel, the defendants also were charged with travelling in interstate commerce with the intent to carry on the distribution of marijuana, a violation of 18 U.S.C. §§ 2 and 1952. Simpson, Steve Pressel, and "Bill" have not been apprehended. Pruett and Meyer (to whom Crook was to make a delivery) pleaded guilty to conspiracy. Rick Pressel, Barry Stevenson, Gary Stevenson, and Ronald Vesper stood trial and were convicted by a jury on February 27, 1990. Rick received an eight-year prison term and has not appealed his conviction. Barry received a ten-year term for the conspiracy conviction and three years for the traveling in interstate commerce conviction, the terms to run concurrently. Gary Stevenson and Ronald Vesper were convicted for conspiracy to distribute. Gary was sentenced to nine years in prison, Vesper to four.

In this consolidated appeal, the Stevensons and Vesper challenge several aspects of their convictions and sentences. We begin with Gary Stevenson. He maintains that the Pressels' marijuana ring operated in two separate spheres: Illinois and Ohio. There was an Illinois organization whereby the Pressels obtained trunkloads of marijuana for Earl Bond. The marijuana was driven up from Atlanta. Once the dope arrived in Illinois, it was brought to various locations such as Jack Wilhelm's house or Ronald Vesper's trailer for further distribution. Gary argues that he had no involvement with this southern Illinois–St. Louis "branch."

The ring also operated in the Dayton, Ohio area. Between 1983 and 1986, Gary formed a partnership with a Dan Gress, whereby they obtained marijuana from Steve Pressel for sale to others. The Stevenson brothers brought trunkloads of marijuana—anywhere from 30 to 150 pounds per load—to Gress' apartment approximately fifteen times. Both Gary and Barry also brought a couple of loads over to Gress' girlfriend's residence. Gress would pay whoever brought the dope. The Gress–Stevenson partnership often used Gress' girlfriend's brother, Jim Beam, to pick up the marijuana in Florida and bring it back to Ohio. (The origin of the marijuana is significant because the Atlanta dope always was directed to the Missouri–Illinois operation; the Florida dope went to Dayton. No matter where the dope came from, the money went to Ohio.)

According to Gary, the Illinois and Ohio operations were not part of a single conspiracy but, rather, were "spokes of the same wheel, with Steve Pressel being the hub of the wheel." Appellant's Brief at 16. In Gary's words, there was "a fatal variance between the single conspiracy charged in the indictment and the multiple conspiracies adduced at trial, resulting in evidentiary spillover and a deprivation of the right to a fundamentally fair trial." *Id.* at 14. In *United States v. Townsend*, 924 F.2d 1385 (7th Cir.1991), we indicated that "a conspiracy variance claim amounts to a challenge to the sufficiency of the evidence supporting the jury's finding that each defendant was a member of the same conspiracy." *Id.* at 1389. There is no material variance from an indictment charging a single conspiracy "if a reasonable trier of fact could have found beyond a reasonable doubt the existence of the single conspiracy charged in the indictment." *Id.* (quotation omitted). Such a finding may be inferred from circumstantial evidence. *See United States v. Durrive*, 902 F.2d 1221, 1225 (7th Cir.1990).

Here, the evidence establishes that Gary knew of, and intended to join, the agreement between Steve Pressel and others to sell marijuana in *both* the Ohio and Illinois operations. One give away is the appearance and reappearance of Chevrolet Caprices, the car of choice for the Pressels' operations because of its large trunk space. Gress testified that he once allowed Steve to use his Chevrolet Caprice to pick up a trunkload of marijuana in Florida. Gress became concerned when a week passed and the car had not returned. Gress asked Gary about it and was told that "the car was in Atlanta and not to worry about it." Trial Transcript ("Tr.") at II–97–98. Later, when the organization stuck Gress with some wet marijuana that he couldn't sell, he fell behind in his payments to Steve. Gary informed Gress that Steve was getting mad, and that if Gress did not sell the dope, Steve was going to kill him. Gress soon got out of the marijuana trade.

Another indication that Gary was part of the overall conspiracy was that, on another occasion, after checking first with Steve, he used a plural pronoun to let Jim Beam know that "*they* would let him drive." Tr. at II–99. Then, just prior to Christmas 1984, Gary instructed Beam to take a Chevrolet Caprice to a motel in Fort Lauderdale, Florida and leave it there. When Beam arrived in Florida, he met with Barry Stevenson and Rick Pressel. They had a gun and a large amount of cash. Beam flew back to Dayton the next day, leaving the car behind. He was paid $400 for the job. A few days before Christmas 1984, Rick made at least one delivery in Illinois in a Caprice Classic with Ohio license plates.

In early 1985, Gary again approached Beam. This time, he told him he was going to bring marijuana from Florida to Dayton and asked him to put a car in his name. The car Gary gave Beam was a 1978 Chevrolet Caprice registered to Rick Pressel. Gary gave Beam the title to the car and money for insurance. Later that spring, Beam signed the title to the car in blank and gave it to Gary. On May 13, 1987, when agents searched Rick's house in Centerville, Ohio, they found a tax form in the master bedroom showing that Beam had sold the Caprice to Rick on January 1, 1986. The agents also found a large quantity of marijuana, a 1981 Caprice loaded with marijuana, and records that matched those seized from Pruett's room at the Breckenridge Hotel near St. Louis. In addition, they found a copy of an order form containing names and marijuana weights. Among the notations was "Gary, 329.6" and "GBS, 62.8."

The day Rick was raided, Steve told a friend and customer, Greg Pearson, what had happened. Steve asked Pearson if he could use his house to hold a meeting. Steve also asked Pearson if he kept any records around the house pertaining to his marijuana business. Pearson agreed to let Steve use the house, but he himself was not present for the meeting because he had to attend a lodge function. When he returned home, he saw Steve and Gary burning papers in the fireplace. Barry also was present.

When questioned by the authorities, Pearson gave a statement implicating the Pressel brothers and Gary in marijuana trafficking. Steve went to Pearson's house to tell him that he would "blow his brains out" if he did any further talking. Tr. IV–73. He left and returned an hour and a half later with Gary. Gary asked Pearson to go down to the basement because he wanted to talk to him. There, Gary asked Pearson "what was coming off and what [he] was doing." Tr. IV–74. As Pearson started for the stairs, Gary grabbed him and told him never to turn his back to him again. Steve started reaching towards Gary's coat as though he was grabbing for

a gun and stated, "I ought to blow your brains out now." *Id.*

In short, the evidence was sufficient to support the inference of a single conspiracy the object of which was the distribution of marijuana in Illinois, Missouri, Florida, Georgia, Ohio, and elsewhere. "If there is one overall agreement among the various parties to perform different functions in order to carry out the objectives of the conspiracy, the agreement among all the parties constitutes a single conspiracy." *United States v. Read*, 658 F.2d 1225, 1230 (7th Cir.1981) (quoting *United States v. Varelli*, 407 F.2d 735, 742 (7th Cir.1969)). For his part, Gary Stevenson helped transfer cars for Steve Pressel, who was at the helm of the overall conspiracy. Through his company, Colonial Builders, Gary supplied David Pruett with beepers to keep in touch with Steve Pressel and Dan Simpson—players in the southern Illinois–St. Louis operation. Gary enlisted individuals such as Jim Beam to meet with Barry Stevenson and Rick Pressel—the very same people who were bringing dope into the southern Illinois and St. Louis areas. He was present when records were burned in Greg Pearson's fireplace just after the raid on Rick Pressel.

Together with Steve Pressel, Gary threatened Pearson because he had talked to the authorities about the distribution ring's activities. Alone, he threatened Gress when he fell behind in his payments to Steve Pressel. Viewing the evidence, as we must, in the light most favorable to the government, we conclude that any rational trier of fact would have found that Gary Stevenson knowingly and intentionally engaged in a single conspiracy as charged in the indictment, *see Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979), and that he was not, as he insists, just another customer of Steve Pressel's.

As to his sentence, Gary argues that the district court committed reversible error by considering amounts of marijuana not connected to him. He claims that his sentence should have been based upon his involvement with 2,250 pounds of marijua-

na (the amount connected to Dayton) instead of the 13,680 pounds related to both branches of the operation. Because Gary Stevenson's crimes occurred before November 1, 1987, the effective date of the Sentencing Guidelines, the Guidelines are inapplicable. *See* 18 U.S.C. § 3551; *United States v. Stewart,* 865 F.2d 115, 118 (7th Cir.1988). For sentences imposed prior to the implementation of the Guidelines,. our standard of review is extremely limited. *See United States v. Dougherty,* 895 F.2d 399, 405 (7th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 3249, 111 L.Ed.2d 759 (1990). We will not reverse a pre-Guidelines sentence unless it exceeds the statutory limits or the district court abused its discretion. *United States v. Johnson,* 903 F.2d 1084, 1089 (7th Cir.1990).

■ Each conspirator in a drug conspiracy charge is responsible, not only for the drugs in his immediate possession or control, but also for the acts and offenses of each one of his coconspirators committed in furtherance of the conspiracy. In this regard, Gary's involvement in the distribution ring was much greater than the 2,250 pounds involved in the Dayton operation. The jury found him guilty of participating in one overall conspiracy involving some 13,680 pounds of marijuana. Before imposing the nine-year prison sentence, the district court heard all the evidence at trial and read the presentence report. The court carefully considered Gary Stevenson's involvement in the conspiracy as well as any factors in his favor. In the absence of evidence to the contrary, we must conclude that the sentence imposed was a proper exercise of the court's discretion.

■ Barry Stevenson's challenge to his sentence fares no better than brother Gary's. He states that, as a minor player and driver, he played a relatively insignificant role in the conspiracy as compared to Rick Pressel and Gary, who received lesser sentences. Therefore, he argues, the ten-year term of imprisonment imposed by the district court was unreasonable. Again, because this case was not covered under the federal Sentencing Guidelines, we will overturn the sentence only if the sentencing judge relied on improper or unreliable information in exercising his discretion.

■ In pre-Guidelines cases, the sentencing court may consider the defendant's background, character, and conduct. Indeed, there is "little limit on the type of information the district court can consider in sentencing." *United States v. White,* 888 F.2d 490 (7th Cir.1990). We give judges a wide berth in imposing sentence, the only restriction being "due process limitations on the degree to which the judge may rely on convictions obtained without the benefit of counsel, or convictions based on materially false or unreliable information." *United States v. Lawrence,* 934 F.2d 868, 874 (7th Cir.1991) (citation omitted). The fact that Barry was not a kingpin in the distribution ring does not mean that the trial court's sentence was an abuse of discretion. Barry was involved in the interstate transport of a minimum of 13,-680 pounds of marijuana to Illinois and Ohio. Not only was he heavily involved in the conspiracy, but he had a more extensive criminal past than the other defendants, including a prior felony conviction. Against this background, the fact that he received a higher sentence than the other defendants did not constitute an abuse of discretion.

■ Our last appellant, Ronald Vesper, has a somewhat different complaint. Vesper's role in the marijuana distribution ring was to store the dope until it was picked up and to provide a location for the exchange of drugs and money. At trial, Vesper objected to the introduction of evidence that he had run a "stash house" (i.e. a storage facility) prior to the dates mentioned in the indictment. Five different witnesses testified that, between 1981 and 1984, they either dropped off or picked up a load of marijuana at the trailer of a fellow called "Hooter" in Staunton, Illinois. Vesper's nickname is Hooter and he had a trailer in Staunton.

Fed.R.Evid. 404(b) provides that evidence of other crimes, wrongs, or acts is admissible to show "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

During the trial, there was evidence that Vesper allowed his trailer and nearby abandoned cars to be used to store marijuana for the Pressel organization, that he was present during discussions related to the transfer of marijuana, and that he helped unload a particular delivery. The government sought the introduction of testimony regarding Vesper's previous conduct as a stash house operator to show that he had the intent to perform a similar role in the Pressel operation. The trial court permitted the testimony and gave the jury a limiting instruction that they could consider the evidence of other acts only for the purpose of establishing intent, knowledge, and identity.

We review district courts' admissions of evidence only to determine whether, by admitting the evidence, the court abused its discretion. *United States v. York*, 933 F.2d 1343, 1348 (7th Cir.1991); *United States v. Cox*, 923 F.2d 519, 523 (7th Cir. 1991). Traditionally, "special deference" is given to the evidentiary rulings of the trial court. *York*, 933 F.2d at 1348; *United States v. Shukitis*, 877 F.2d 1322, 1327 (7th Cir.1989). This circuit uses a four-prong test to determine whether evidence of acts other than those charged are admissible. Prior to admitting "other acts" evidence under Rule 404(b), the trial court must determine that:

> (1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged, (2) the evidence shows that the other act is similar enough and close enough in time to be relevant to the matter in issue, (3) the evidence is sufficient to support a jury finding that the defendant committed the similar act, and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice.

*United States v. Briscoe*, 896 F.2d 1476, 1499 (7th Cir.1990); *United States v. Shackleford*, 738 F.2d 776, 779 (7th Cir. 1984).

Applying this test to the facts of this case, we conclude that Vesper has failed to establish a clear abuse of discretion sufficient to justify a reversal of his conviction. The disputed testimony showed Vesper's intent and knowledge rather than his propensity to participate in a marijuana distribution conspiracy, thus satisfying prong one of the test. Prong two also is satisfied: Vesper's acts of storing marijuana for further distribution in 1981–82 are identical to his acts in 1984–87. Moreover, the previous acts took place within a few years of the conspiracy charged. As to prong three, there was sufficient evidence for the jury to find that "Hooter" Vesper's trailer was being used as a "stash house." Fred Crook testified that he picked up marijuana at Hooter's place in Staunton on several occasions and that he used the location to hold discussions with Earl Bond and others regarding the deliveries. Tr. IV–23–27. Finally, we find that the probative value of the evidence of Vesper's prior role as stash house operator was not outweighed by the danger of unfair prejudice. There was other evidence linking Vesper to the Pressel distribution ring and, in addition, the trial court's limiting instruction would have dispelled any prejudicial effect. We conclude that the trial judge did not abuse his discretion in admitting the "other acts" evidence.

For the foregoing reasons, the convictions and sentences of Gary Stevenson, Barry Stevenson, and Ronald Vesper are

AFFIRMED.