UNITED STATES of America,
Plaintiff–Appellee,

v.

William C. HUBBARD, also known as Robert Lee Austin, Jr., also known as Dunno, also known as Teddy Braxton, and Rodney Anderson, Defendants–Appellants.

Nos. 93–1304, 93–1324.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 4, 1994.

Decided April 27, 1994.

Rehearing and Suggestion for Rehearing En Banc Denied June 21, 1994.

John N. Gallo, Asst. U.S. Atty. (argued), Crim. Div., Barry R. Elden, Asst. U.S. Atty., Crim. Receiving, Appellate Div., Chicago, IL, for U.S.

George C. Howard, Julius L. Echeles (argued), Chicago, IL, for William C. Hubbard.

James D. Montgomery (argued), Lawrence Warren, Thomas C. Marszewski, Montgomery & Associates, Kevin E. Milner, Law Offices of Kevin E. Milner, Chicago, IL, for Rodney Anderson.

Before FAIRCHILD, MANION, and KANNE, Circuit Judges.

MANION, Circuit Judge.

A jury convicted defendants Rodney Anderson and William Hubbard each of one count of conspiring to manufacture and possess with intent to distribute phencyclidine ("PCP") in violation of 21 U.S.C. § 846. The district court sentenced Anderson to 262 months in prison and Hubbard to 360 months in prison. Both defendants appeal their convictions and sentences. We affirm.

## I. Background

During the summer of 1991, Rodney Anderson and William Hubbard plotted to obtain piperidine (a chemical necessary for the production of PCP) and to manufacture liquid PCP. This was not the defendants

first PCP enterprise. Anderson had been involved in the distribution of PCP as early as December of 1989. Hubbard (also known as "Dunno" and Robert Austin) had been involved with PCP from 1979 to 1983, during which time he manufactured and sold PCP with his partner Peter Coley ("Coley").

In May of 1991, Hubbard was contacted by his former partner Coley. Coley, a resident of a Little Rock, Arkansas jail, now had a new partner—the United States government. During their conversations, Hubbard told Coley that he was involved in selling PCP in "four or five different states" and that he was interested in buying piperidine so that he could manufacture PCP. Hubbard explained that he had access to the other chemicals necessary to make PCP, including 1800 gallons of ether, but that he did not have access to piperidine. On May 15, 1991 Hubbard and Coley negotiated a price for the piperidine and the amount of liquid PCP that Hubbard would supply Coley from the processed piperidine batch.

On May 21, 1991, Hubbard met with one of Coley's associates, "Tony" (who in fact was Special Agent Tony Bailey) to finalize the piperidine transaction. During their meeting, Hubbard told Tony that he would not be present when the PCP was made. Coley phoned Hubbard the next day to express concern over Hubbard's absence from the laboratory during the manufacturing of the PCP. Hubbard reassured Coley that he had been making PCP for years, using the process that Coley had taught him during their partnership in the early eighties. He also assured Coley that the people making the PCP worked for him and that he had taught them how to make the PCP. Hubbard further stated that he would be present during the last and most difficult stage of the manufacturing process and nearby at other times.

On May 29, 1991, Hubbard again met with Tony to finalize the piperidine transaction. On June 3, 1991, however, Hubbard, suspecting police involvement, called off the deal. Hubbard later told Coley of his suspicions and stated that the piperidine transaction was "on ice." The ice thawed and on July 8, 1991 Hubbard was back on the phone with Coley trying to buy some piperidine. During their conversation, Hubbard discussed exchanging crack cocaine for twenty-five gallons of piperidine. These negotiations ended, however, without a deal.

In addition to negotiating with Hubbard, Coley was also negotiating with Anderson for the purchase of piperidine, and on July 25, 1991 Anderson and Coley agreed on a price of $1500 for each gallon of piperidine. This piperidine transaction, however, was postponed because Anderson was injured when he accidentally started a fire while manufacturing PCP. The fire also destroyed twenty gallons of PCP.

Undaunted by the mishap, Anderson was ready to proceed with the piperidine transaction on August 12, 1991 when he asked Coley if he could still obtain ten gallons of piperidine for him. That same day, Anderson also asked Warren Lowe, Coley's Chicago "contact" and an undercover DEA agent, when the piperidine would be available. Lowe responded "early Wednesday" to which Anderson replied "[t]hat sounds good, so I let the people know." The next day, Anderson told Coley that the buyer only wanted an initial five gallons of piperidine, because the buyer wanted to minimize any loss if the piperidine did not produce quality PCP. Anderson added, however, that the buyer would purchase an additional ten gallons from Coley if the piperidine was high quality. Anderson also told Coley to have Lowe call at any time and he would immediately page the buyer to finalize the arrangement. The piperidine transaction was arranged shortly thereafter for the next day.

On the following day, August 14, 1991, Lowe contacted Anderson. Lowe told Anderson that he had the piperidine and wanted to complete the transaction quickly. A little later, Anderson and Hubbard arrived at the parking lot where Lowe was waiting. Anderson told Lowe to follow him to his garage. At the garage, Lowe removed a five-gallon barrel containing piperidine from his car and brought it inside. Once inside the garage, Anderson stated "[w]e gonna set [1] these, and if they come back pretty. . . .

1. The process of manufacturing PCP involves numerous stages. The first stage is called "set-

I'm gonna give you a call later on." Hubbard then paid Lowe $7,500 and Lowe left. Later that afternoon, Anderson and Hubbard gave an unidentified man the piperidine barrel. The unidentified man left with the barrel in the trunk of his rented car. Anderson and Hubbard then also left.

Based on the foregoing events, federal agents obtained a warrant to search the garage where Lowe had met with Hubbard and Anderson. They executed the warrant on August 14, 1991. During the search, the agents discovered Anderson hiding in a small vent in the garage rafters. One of the agents, Agent Hardcastle, advised Anderson that he was under arrest for "conspiracy to attempt to manufacture PCP or liquid phencyclidine." Anderson responded "[b]ecause of that boy that was by today that sold us that pipe." Agent Hardcastle advised Anderson of his *Miranda* rights but Anderson responded that he wished to cooperate with the agents. Anderson then proceeded to tell the officers that another person was buying the piperidine in order to make PCP at a farm in Crete, Illinois with a person named Clyde. Anderson also stated that he had the buyer's pager number. The agents found $1010 in cash on Anderson, $600 of which Anderson alleged came from that buyer. Anderson also directed Agent Hardcastle to a notebook containing Hubbard's pager number. Agent Hardcastle also seized Anderson's pager.

After Anderson was taken to the DEA office and processed, he executed a written waiver of his constitutional rights and agreed to assist the government. Anderson then repeated some of his earlier statements. He also added that Clyde had introduced him to the buyer and that, with the exception of the piperidine, Clyde and the buyer had all the chemicals necessary to make PCP. He added that twenty of the gallons of the PCP were going to be sold in New York. Anderson also told the officers that he had accidentally started a fire in his garage while making PCP and that the fire had destroyed twenty gallons of PCP. He further admitted that because he lost the PCP in the fire, he

was helping the piperidine buyer so that he would have a new source of PCP.

While Anderson was at the DEA office, his pager went off. The government allowed Anderson to respond to the page (from Hubbard) because Anderson had agreed to cooperate with the government. During his conversation with Hubbard, however, Anderson stated "I feel bad" which Agent Hardcastle interpreted as an attempt by Anderson to warn Hubbard of his arrest. During their conversation, Hubbard also told Anderson to "be really cool."

On August 15, 1991, after Anderson was released from custody, Hubbard again paged Anderson. Anderson told Hubbard that he "was waiting to hear back from you to see that you all had ... what you want ... so I could get some more for you you know." Hubbard then asked if Anderson had talked to Clyde and Anderson said that he had. Hubbard also informed Anderson that the police had watched their transaction, had followed his "people" and had bugged the piperidine barrel.

During the month following Anderson's release, he repeatedly violated the instructions given him regarding his cooperation with the government. For example, Agent Hardcastle "advised him that he was not to re-enter the garage ... while he was cooperating with the government, and that he was not to disturb anything inside, he was not to remove anything inside, nor allow anyone to remove anything, and if such a thing did occur and came to his knowledge, he was to expressly let me know." Agent Hardcastle also told Anderson that he must contact him "prior to any type of contact with any potential defendant, or if any contact inadvertently did occur with a defendant, he was to immediately let me know." Notwithstanding these instructions, Anderson met with suspects on at least seven occasions. He also provided others access to his garage and allowed them to remove the vehicles in the garage; and after Agent Hardcastle discovered that the vehicles were removed, Anderson initially denied any knowledge before admitting that he allowed the people into the garage. About a week later, Anderson stopped returning

ting the crystals" and involves combining piperi-　dine with other chemicals.

Agent Hardcastle's pages, at which time the government no longer considered Anderson in "a cooperative mode" with their investigation. Federal agents later executed a seizure warrant at the garage. During the execution of the warrant, the government discovered and seized small vials of liquid PCP. The government charged Anderson with conspiring to manufacture and possess with intent to distribute PCP.

On September 18, 1991, the police also arrested Hubbard for conspiring to manufacture and possess with intent to distribute PCP. During Hubbard's arrest, the police seized numerous items including: (1) a business card with Agent Bailey's phone number; (2) a card with a reference to "ruthenium"— an ingredient of piperidine; (3) cards in the name of Hubbard's alias, Robert Austin of Capital International Investments; (4) a card with handwritten names of chemicals used to dissolve PCP crystals; and (5) his pager, registered to "Robert Austin". The police obtained a warrant to search Capital International Investments. During that search the agents found a statement for an American Express Gold Card in the name of "Robert Austin." The statement included a charge for the rented car used to transfer the piperidine on August 14, 1991.

Both Hubbard and Anderson pleaded not guilty and were scheduled for trial. Prior to trial, the court informed Anderson of a possible conflict of interest with his attorney stemming from a grand jury investigation in which his attorney was named as being involved in illegal drug transactions. Notwithstanding the potential conflict, Anderson agreed to continue with his present attorney.

Also before trial, Hubbard filed a motion for a severance. Hubbard claimed that he was entitled to a trial separate from Anderson because the government intended to introduce post-arrest statements of Anderson's which implicated Hubbard. The court denied the motion for severance and instead required the government to redact any reference to Hubbard. The case then proceeded to trial. At trial, the government introduced Anderson's post-arrest statements but in doing so redacted any reference to Hubbard. The court also instructed the jury that the post-arrest statement should only be considered as to defendant Anderson.

At trial, numerous federal agents testified to the facts set forth above. This testimony supplemented actual tape recordings of the conversations between Hubbard, Anderson and the various undercover agents. The government also presented evidence that in June of 1991, Anderson had agreed to sell a government informant named George Roberts four sixteen-ounce bottles of liquid PCP for $8000. At no time did Anderson object to the admission of this evidence. Further evidence came from government witness Peter Gabiola. Gabiola testified that while Hubbard was in custody, Hubbard had told him that he had bought piperidine to make PCP, that he had been making PCP for several years, and that he had made a lot of money as a result. After the presentation of the evidence, the jury convicted Anderson and Hubbard each of one count of conspiring to manufacture and possess with intent to distribute phencyclidine ("PCP"). The district court sentenced Anderson to 262 months in prison and Hubbard to 360 months in prison.

## II. Anderson's Appeal, No. 93–1324

On appeal Anderson claims that the evidence was insufficient to support his conviction for conspiring to manufacture and possess with intent to distribute PCP. Anderson also challenges an aiding-and-abetting instruction given the jury, claiming that the evidence was insufficient to support that instruction and, in any event, the instruction given was an incorrect statement of the law. Anderson further challenges two evidentiary rulings made by the district court. Finally, Anderson asserts that he was denied his Sixth Amendment right to effective assistance of counsel because of an alleged conflict of interest by his attorney.

### A. Sufficiency of the Evidence

Anderson first argues that the evidence was insufficient to convict him of conspiring to manufacture and possess with intent to distribute PCP. "[A] defendant challenging a conviction on the ground of insufficient evidence bears a heavy burden." *United States v. Brown*, 7 F.3d 648, 655 (7th Cir.

1993). " '[W]e review all the evidence and all the reasonable inferences that can be drawn from the evidence in the light most favorable to the government.'" *United States v. Nesbitt*, 852 F.2d 1502, 1509 (7th Cir.1988) (quoting *United States v. Pritchard*, 745 F.2d 1112, 1122 (7th Cir.1984)). If the evidence establishes that " 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt,'" we must uphold the verdict. *Brown*, 7 F.3d at 655 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). We may not reweigh the evidence or reassess the credibility of witnesses. *Id.* Consequently, we may overturn a verdict only if "the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt...." *United States v. Briscoe*, 896 F.2d 1476, 1504 (7th Cir.1990) (quoting *United States v. Whaley*, 830 F.2d 1469, 1473 (7th Cir.1987)).

■ To prove that Anderson was involved in a conspiracy, "the government must show both that he knew of the conspiracy and that he intended to join its criminal purpose." *United States v. Fort*, 998 F.2d 542, 546 (7th Cir.1993). The evidence, when viewed in the light most favorable to the government, established that Anderson conspired with Hubbard and others to manufacture and possess with intent to distribute PCP. Specifically, the evidence demonstrated that Anderson was making a batch of PCP at his garage when a fire broke out destroying the PCP and the component chemicals. The evidence also established that after the fire, Anderson obtained piperidine for Hubbard so that Hubbard would be able to make PCP and thereby provide Anderson with a new source of PCP. The testimony further established that Anderson and Hubbard planned to make additional batches if the piperidine proved satisfactory. This included Officer Lowe's testimony that Anderson stated, in the presence of Hubbard, that "[w]e gonna set these," (referring to the piperidine crystals) and if all went well, Anderson would contact Lowe to arrange a second transaction. A "defendant's ongoing relationship with members of the conspiracy is probative of his membership" in the conspiracy. *United States v. Cabello*, 16 F.3d 179, 182 (7th Cir.1994) (citing *United States v. Edwards*, 945 F.2d 1387, 1397 (7th Cir.1991)).

In response, Anderson claims that he was just a middleman. He alleges that all he did was "bring together a willing buyer and willing seller for the purpose of purchasing piperidine." He points to *United States v. Blankenship*, 970 F.2d 283 (7th Cir.1992), and claims that this case prevents a finding of a conspiracy in such a situation. In *Blankenship*, the defendant allowed members of a long-running conspiracy to use his home for one day in return for a one-time payment. We reversed the defendant's conviction for conspiring to manufacture and distribute methamphetamine, concluding that the defendant's actions in renting out his home did not make him part of the drug distributing conspiracy. In this case, however, Anderson's involvement was not merely limited to bringing a buyer and seller of piperidine together at his garage. For example, Anderson's statements: "*We* gonna set these" and "because of that boy was by today that sold *us* [the piperidine]" established that he considered himself to be part of the enterprise and was actually involved in the purchase of the piperidine and the manufacturing of the PCP. Even more persuasive is Agent Hardcastle's testimony that Anderson stated that he joined with Hubbard to arrange for the manufacture of PCP so that he would have a new source of PCP after his was destroyed. From this evidence a jury could have reasonably concluded that Anderson joined Hubbard "to accomplish a criminal objective." *United States v. Townsend*, 924 F.2d 1385, 1394 (7th Cir.1991). We accordingly reject Anderson's sufficiency argument.

### B. *Aiding and Abetting Instruction*

Anderson next challenges the district court's aiding and abetting instruction. Anderson's challenge is two-fold. First, he claims that the evidence was insufficient to support the instruction. Second, he claims that the instruction misstates the law.

■ An instruction for aiding and abetting is proper if the evidence gives rise to an inference that a defendant "knowingly facilitated" the distribution of illegal drugs. *United States v. Ruiz,* 932 F.2d 1174, 1181 (7th Cir.1991). Again Anderson claims, as noted above, that he merely facilitated a purchase of piperidine; he claims that he did not share the criminal intent to manufacture and distribute PCP. As noted above, the evidence establishes that Anderson assisted Hubbard in buying piperidine for the purpose of making PCP and establishing a new source. Thus Anderson's argument that the evidence was insufficient for an aiding and abetting instruction must fail.

This leaves us with Anderson's second claim—that the aiding and abetting instruction was an improper statement of the law. The district court instructed the jury as follows:

> A defendant can be guilty of a conspiracy by aiding and abetting that conspiracy. A defendant is guilty of aiding and abetting a conspiracy if he knowingly commits an act in furtherance of the conspiracy and has knowledge of the conspiracy's purpose at the time he commits the act. One can aid and abet a conspiracy without having been an original member of the conspiracy.

Anderson claims that this instruction was insufficient to inform the jury of the requirements for aiding and abetting liability, which include: (1) association with an unlawful venture; (2) knowing participation in it; and (3) active contribution toward its success. *United States v. Valencia,* 907 F.2d 671, 677 (7th Cir.1990). Anderson points to the pattern jury instruction as a model of an appropriate instruction. This provides:

> Any person who knowingly aids, abets, counsels, commands, induces, or procures the commission of a crime is guilty of that crime. However, that person must knowingly associate himself with the criminal venture, participate in it, and try to make it succeed.

■ Anderson argues that the instruction the judge gave did "not address the pattern instruction's points regarding making the conspiracy succeed by his actions or the defendant's desire to bring about the objec-

tives of the conspiracy." A court, however, has broad discretion in formulating the precise language of its instruction. *United States v. Rice,* 995 F.2d 719, 724 (7th Cir. 1993). "'As long as the instruction treats the issues fairly and adequately, they will not be interfered with on appeal.'" *United States v. McNeese,* 901 F.2d 585, 607 (7th Cir.1990) (quoting *United States v. Fournier,* 861 F.2d 148, 150 (7th Cir.1988)). Moreover, in reviewing jury instructions, we must consider jury instructions as a whole. *Rice,* 995 F.2d at 724. In addition to the above aiding and abetting instruction, the district court also instructed the jury that "[m]ere presence at the scene of a crime and knowledge that a crime is being committed are not sufficient to establish the guilt of a defendant; rather it must be shown beyond a reasonable doubt that the defendant associated himself with the criminal venture, participated in it, and sought to make it succeed." This instruction further eliminated any possible misunderstanding the court's formulation may have created. Thus, as a whole, the instructions given sufficiently informed the jury of the requirements for aiding and abetting liability.

### C. *Evidentiary Rulings*

Anderson asserts two evidentiary errors. First, he claims that the district court erred in admitting tapes of conversations he had with Hubbard after his arrest. Second, he claims that the district court erred in admitting 404(b) evidence that he sold PCP to Roberts.

#### 1. *Taped post-arrest statements.*

■ The district court admitted tape recordings of two telephone conversations Anderson had with Hubbard after Anderson's arrest. Anderson claims that this evidence was inadmissible because the statements were involuntary. Anderson also claims that even if the statements were voluntary, they were inadmissible hearsay.

To determine the voluntariness of a statement, we must consider the totality of the circumstances and determine whether the law enforcement officials overbore the ac-

cused's will. *Haynes v. Washington,* 373 U.S. 503, 513–14, 83 S.Ct. 1336, 1342–43, 10 L.Ed.2d 513 (1963). The police advised Anderson of his *Miranda* rights and in response Anderson agreed to cooperate. Anderson does not claim on appeal that his cooperation was physically coerced. In fact, the second taped conversation occurred after Anderson was released from custody. As a whole, the record is devoid of any evidence whatsoever that Anderson's statements were involuntary. In addition, Anderson's argument on appeal belies any such conclusion. Anderson claims in his briefs that "[d]oing what he was told to do, in an effort to please, is a very natural and expected reaction, ... He was willing to do whatever he could to help himself. Giving Hardcastle what he wanted, an opportunity to apprehend Hubbard, was, quite logically, Anderson's driving motivation." By Anderson's own admission, this is not a case where the law enforcement officials overbore his will; rather, he participated willingly in an effort to improve his own situation.

Anderson asserts that even if the statements were voluntary, they were inadmissible under the Federal Rules of Evidence. The tapes contained statements of both Anderson and Hubbard. Anderson's statements were admissible under Rule 801(d)(2)(A) as admissions of a party opponent.[2] Hubbard's statements were also admissible pursuant to Rule 801(d)(2)(E) as statements of a co-conspirator.

Anderson claims that Hubbard's statements were not statements of a co-conspirator because Anderson had withdrawn from the conspiracy when he began assisting the government. We have considered the "novel" question of the interplay between Rule 801(d)(2)(E) and withdrawal from a conspiracy in *United States v. Patel,* 879 F.2d 292 (7th Cir.1989). In *Patel,* we concluded that to withdraw from a conspiracy, such that statements of a co-conspirator are inadmissible, the conspirator must make an "affirmative action, either the making of a clean

breast to the authorities, or communication of the abandonment in a manner calculated to reach co-conspirators." *Id.* at 294.

Anderson did not inform Hubbard of his withdrawal from the conspiracy. He also did not make "a clean breast to the authorities." After Anderson's arrest, he continued to associate with known targets of the DEA investigation. He also allowed these other "targets" access to the garage to remove vehicles. Moreover, Agent Hardcastle testified that he believed that Anderson had attempted to warn Hubbard of the police involvement during his first post-arrest conversation with Hubbard. Attempting to warn a co-conspirator demonstrates that "a clean breast to authorities" has not occurred. *Id.* at 294. From these circumstances, it was reasonable to conclude that Anderson did not withdraw from the conspiracy. Therefore, the district court did not err in admitting the post-arrest statements under Rule 802(d)(2)(E).

### 2. *Rule 404(b) evidence.*

Anderson's second evidentiary challenge concerns the admission of evidence concerning Anderson's sale of liquid PCP to Roberts in June of 1991. This evidence included the direct testimony of government informant Roberts, as well as tape recordings of conversations between Anderson and Roberts. Anderson claims that this evidence was inadmissible evidence of prior bad acts. *See United States v. Harvey,* 959 F.2d 1371, 1373–74 (7th Cir.1992). Federal Rule of Evidence 404(b), however, "provides that evidence of other crimes, wrongs, or acts is admissible to show proof of motive, opportunity, intent...." *United States v. Stevenson,* 942 F.2d 1111, 1117 (7th Cir.1991). The government sought introduction of the evidence of the prior PCP sale to establish Anderson's intent and it was admitted for that limited purpose. Anderson did not object to the admission of this evidence. Therefore, we review for plain error only.

---

**2.** Anderson argues that Rule 801(d)(2)(A) does not apply to his statements because statements under Rule 801(d)(2)(A) must be a "party's own statement" and his statements were made at the bequest of the police and were, therefore, not his own. This argument is nothing more than another challenge to the voluntariness of his statements. We have already rejected this argument and accordingly need not reconsider the issue here.

*United States v. Baltrunas,* 957 F.2d 491, 495 (7th Cir.1992). Plain error is error which "implies the conviction of one who but for the error would have been acquitted." *Id.* (citations omitted).

This court has established a four-part test for determining whether evidence is admissible under Rule 404(b). Evidence may be admitted pursuant to Rule 404(b) if:

(1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged;

(2) the evidence shows that the other act is similar enough and close enough in time to be relevant to the matter in issue;

(3) the evidence is sufficient to support a jury finding that the defendant committed the similar act; and

(4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice.

*United States v. Briscoe,* 896 F.2d 1476, 1499 (7th Cir.1990).

Anderson has failed to demonstrate that the district court committed plain error in admitting the evidence of the prior PCP transaction. First, the evidence was admitted to prove intent. Intent is a matter in issue, other than defendant's propensity to commit the charged crime. Second, the evidence was closely related to the charged conduct; the charged conduct was conspiring to manufacture and possess with intent to distribute PCP and the evidence related to a sale of PCP; and the related PCP sale occurred within two months of the piperidine transaction. This is a sufficiently close nexus to the charged conduct. *See United States v. Torres,* 977 F.2d 321, 327 (7th Cir.1992) (two years is a sufficiently close nexus). Third, the evidence, which included the taped conversations between Anderson and governmental informant Roberts, Roberts' testimony in person and the actual PCP, was sufficient to demonstrate that Anderson committed the similar act. Finally, the evidence was probative as to Anderson's intent and any prejudicial effect was reduced by the limiting instruction the court gave the jury that the evidence was to be considered on the

question of Anderson's intent. *Id.* at 329; *Stevenson,* 942 F.2d at 1117.

**D. Conflict of Interest**

■ Anderson finally claims that he was denied his Sixth Amendment right to counsel because of an alleged conflict of interest with his trial attorney. The Sixth Amendment right of representation includes a corresponding right to representation free of conflict. *Wood v. Georgia,* 450 U.S. 261, 271, 101 S.Ct. 1097, 1103, 67 L.Ed.2d 220 (1981). "A conflict exists when defense counsel places himself in a position conducive to divided loyalties." *United States v. Carpenter,* 769 F.2d 258, 263 (5th Cir.1985).

■ Anderson claims that a conflict existed because the government was investigating his attorney. Investigation of a defense counsel, without more, is insufficient to demonstrate an actual conflict of interest. *United States v. Balzano,* 916 F.2d 1273, 1293 (7th Cir.1990) (citing *Cerro v. United States,* 872 F.2d 780, 785–86 (7th Cir.1989)). We need not determine whether additional facts created a conflict of constitutional magnitude, however, because Anderson waived his right to conflict-free counsel. *United States v. Roth,* 860 F.2d 1382, 1387–88 (7th Cir.1988). "A waiver is sufficient if it was made knowingly and intelligently, that is to say, if it was made with sufficient awareness of the relevant circumstances and likely consequences." *United States v. Flores,* 5 F.3d 1070, 1078 (7th Cir.1993). "It is enough that the district court inform each defendant of the nature and importance of the right to conflict-free counsel and ensure that the defendant understands something of the consequences of a conflict." *Id.*

The district court satisfied these requirements. Prior to the start of trial, the district court informed Anderson: (1) that during a grand jury investigation his attorney was named as being involved in illegal drug activity; (2) that the attorney was not currently a target of the investigation but could become a target, and could later be prosecuted; (3) that there "is a possibility that, in order to protect himself from prosecution and to curry favor with the prosecutors, [your attorney] might fail to raise on your behalf defenses

that should be raised ... [and] might sell [you] out in order to help himself with the government;" (4) that the attorney might attempt to make a deal with the government; and (5) only his attorney knew "whether there is anything that he could do in your case that would affect the likelihood of his prosecution." In response to these warnings, Anderson stated that he understood what the district court had said. In fact, ·Anderson correctly paraphrased the warning stating that he understood that there was a "possibility that [his attorney] might not perform for me in a hundred percent manner of defending me by him being investigated by the government in which like to sell me out, in a sense." Anderson further assured the district court that he wanted to keep his attorney on the case.

Anderson, however, also requested that a second attorney join in his defense. The district court informed Anderson that if he was concerned about his attorney's loyalty, his attorney should be released, rather than continuing with his present attorney as well as an additional attorney. Anderson, however, continued to maintain that he wanted to keep his first attorney. The district court gave deference to Anderson's choice for representation, which it is required to do. *United States v. Lowry,* 971 F.2d 55, 59-60 (7th Cir.1992). In doing so, the district court noted that "Anderson is a very intelligent person and he understands what we have been talking about here." This exchange clearly demonstrates that Anderson waived any alleged conflict of interest. *See United States v. Kladouris,* 964 F.2d 658, 667 (7th Cir.1992). Whether Anderson made a wise decision is not for us to decide. *Flores,* 5 F.3d at 1078.

*E. Sentencing*

 Anderson claims that the district court erred in sentencing him under Sentenc-

ing Guideline § 2D1.1, which applies to offenses, including attempt, involving manufacturing and possessing drugs with intent to distribute, rather than § 2D1.11, which applies to offenses involving possession of precursor chemicals. The Sentencing Guidelines, however, specifically provide that the applicable Guideline section is determined by "the offense of conviction." U.S.S.G. § 1B1.2(a). Anderson was convicted of conspiring to manufacture and possess with intent to distribute PCP in violation of 21 U.S.C. § 846. The guidelines applicable to the underlying substantive offense apply when a defendant is convicted of conspiracy. U.S.S.G.App. A. Thus Anderson's sentence is based on the substantive offense—21 U.S.C. § 841(a)(1). The Statutory Index references only one Guideline section, Guideline § 2D1.1, as the appropriate section for violations of section 841(a)(1). U.S.S.G.App. A. Thus, the Guideline section most applicable to that offense is Guideline § 2D1.1, captioned "Unlawful Manufacturing, Importing, Exporting, or Trafficking (Including Possession with Intent to Commit These Offenses); Attempt or Conspiracy."

 Anderson contends that even though he was convicted of conspiring to violate section 841(a), § 2D1.11 is the more appropriate Guideline. The Guidelines provide, in part, that "if, in an atypical case, the guideline section indicated for the statute of conviction is inappropriate because of the particular conduct involved, use the guideline section most applicable to the offense conduct charged in the count of which the defendant was convicted." U.S.S.G., Appendix A. Anderson fails, however, to demonstrate that this case is atypical. Instead he claims that "Anderson should not have been charged with violating section 841(a). If anything, section 841(d) was the appropriate charge."[3]

---

**3.** 21 U.S.C. § 841(d) provides:

Any person who knowingly or intentionally—
 (1) possesses a listed chemical [piperidine] with intent to manufacture a controlled substance except as authorized by this subchapter;
 (2) possesses or distributes a listed chemical knowing, or having reasonable cause to believe, that the listed chemical will be used to

manufacture a controlled substance except as authorized by this title; or
 (3) with the intent of causing the evasion of the record-keeping or reporting requirements of section 830 of this title, or the regulations issued under that section, receives or distributes a reportable amount of any listed chemical in units small enough so that the making of

In effect, Anderson is challenging the government's decision to prosecute him under section 841(a) rather than section 841(d). The Supreme Court, however, "has long recognized that when an act violates more than one criminal statute, the Government may prosecute under either so long as it does not discriminate against any class of defendants. Whether to prosecute and what charge to file or bring before a grand jury are decisions that generally rest in the prosecutor's discretion." *United States v. Batchelder*, 442 U.S. 114, 123–24, 99 S.Ct. 2198, 2204, 60 L.Ed.2d 755 (1979). Therefore, it was within the government's discretion to charge Anderson of conspiring to violate section 841(a) and sufficient evidence existed to convict him. *See supra* 1414–15. Therefore, the district court appropriately sentenced him under § 2D1.1.

■■■ Anderson also claims that the district court erred in refusing to grant him a two-level reduction for acceptance of responsibility. Section 3E1.1(a) of the Sentencing Guidelines provides that "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by 2 levels." U.S.S.G. 3E1.1(a). "The sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility. For this reason, the determination of the sentencing judge is entitled to great deference on review." U.S.S.G. 3E1.1, comment. (n. 5). We will overturn a district court's denial of a reduction for acceptance of responsibility only if the decision is clearly erroneous. *United States v. Guadagno*, 970 F.2d 214, 224 (7th Cir.1992); *United States v. Osborne*, 931 F.2d 1139, 1154–56 (7th Cir. 1991).

At no point did Anderson admit that he committed the charged conduct. In fact, at the sentencing hearing Anderson, through his counsel, argued that all he did "was to sell or help somebody buy some chemical" and as a result he was "not guilty." A district court properly denies a defendant a reduction for acceptance of responsibility where the defendant does not admit that he committed the charged offense. *United*

States v. Trussel, 961 F.2d 685, 691 (7th Cir.1992); *United States v. Escobar–Mejia,* 915 F.2d 1152, 1153 (7th Cir.1990). Accordingly, we hold that the district court did not clearly err in denying Anderson a two-level reduction for acceptance of responsibility.

### III. Hubbard's Appeal, No. 93–1304

Defendant Hubbard also challenges numerous aspects of his conviction and sentence. First, he claims that the district court erred in denying his motion for severance. Second, he claims that he received ineffective assistance of counsel. Third, he asserts that the district court erred in denying his motion for a new trial. Finally, he claims that he should have been sentenced under § 2D1.11 instead of § 2D1.1.

#### A. Severance

■■■ Hubbard argues that the district court erred in denying his motion for severance because the admission of his co-defendant's statement violated his Sixth Amendment right of confrontation. This court reviews a district court's ruling on a severance motion for abuse of discretion. *United States v. Emond,* 935 F.2d 1511, 1514 (7th Cir.1991). The defendant must also "demonstrate actual prejudice resulting from the denial." *Id.*

In *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), the Supreme Court "held that a defendant's Confrontation Clause rights were violated when his nontestifying co-defendant's confession incriminating both defendants was admitted into evidence, although the trial court had instructed the jury to consider the confession against only the defendant who had confessed." *United States v. Gio,* 7 F.3d 1279, 1287 (7th Cir.1993), citing *Bruton,* 391 U.S. 123, 88 S.Ct. 1620. Based on *Bruton,* Hubbard claims that testimony concerning Anderson's post-arrest statements violated his Sixth Amendment right to confrontation because Anderson did not testify. Anderson's post-arrest statements identified "Dunno" (Hubbard's alias) as the person with Anderson

---

records of filing of reports under that section is not required;

shall be fined in accordance with Title 18, or imprisoned not more than 10 years, or both.

when Agent Lowe delivered the five-gallon barrel of piperidine. The government, however, redacted the reference to "Dunno," in the statement and replaced it with neutral terms such as "another person" or "other individuals." The court also instructed the jury that the redacted, post-arrest statements of Anderson were to be considered against Anderson only. "This court ... has specifically held that 'the replacement of defendants' names with references such as "another person," combined with an instruction to consider the confession against only the declarant, satisfies *Bruton.*' " *Gio,* 7 F.3d at 1287 (quoting *United States v. Strickland,* 935 F.2d 822, 826 (7th Cir.1991)).

Hubbard claims that the redaction was insufficient to protect his Sixth Amendment right of confrontation because "there could be absolutely no doubt in the jurors' minds that the 'other person' was Hubbard." This court has recognized that in some situations "no sterilizing redaction or limiting instruction could sensibly have removed the inculpatory nature of [the co-defendant's] statement." *United States v. Bigelow,* 914 F.2d 966 (7th Cir.1990). But this case is unlike *Bigelow.* In *Bigelow,* the co-defendant's excluded statement that the police have the "man they wanted" could only have referred to the defendant because the two co-defendants were the only two men involved in the incident. *Id.* at 972. In this case, however, the "other person" referred to in the redacted statement could be any other person. In fact, Hubbard based his entire theory of defense on his position that he was not the "other person" at the garage. It is disingenuous for Hubbard to now claim that a statement referring to "other persons" could only refer to him. Thus any impression that Hubbard was the "other person" must come from other evidence. In fact, Hubbard makes this argument claiming "a[f]ter all, agent Lowe had identified Hubbard as the purchaser of the 'pipe', piperidine." In *Richardson v. Marsh,* 481 U.S. 200, 107 S.Ct.

1702, 95 L.Ed.2d 176 (1987), the Supreme Court has rejected such a " 'contextual implication' argument, which asks that we look beyond the confession to other evidence presented at trial to determine if [the codefendant] was incriminated ..." *Gio,* 7 F.3d at 1287 (citing *Richardson,* 481 U.S. at 209, 107 S.Ct. at 1708). Accordingly, we hold that the redacted confession, combined with the limiting instruction, complied with the Sixth Amendment right of confrontation. Because we find that Hubbard's Sixth Amendment right of confrontation was not violated, we hold that the district court did not abuse its discretion in denying Hubbard's motion for severance.[4]

Hubbard also argues that a due process violation is implicated because "[t]he gnawing knowledge that Anderson tried to set him up certainly caused a chilling effect on any possibility of Hubbard's seeking Anderson's cooperation in defense tactics. It strikes as being underhanded that a former informant for the government would occupy a co-defendant's relationship in the same case." Hubbard, however, fails to specify how the due process clause is implicated, much less cite any case law supporting this argument. Hubbard also argues that the due process clause was violated because without a severance he could not call Anderson to refute the testimony concerning his post-arrest statements. This evidence, however, was not admitted against Hubbard. Accordingly, we also reject his due process claim.

*B. Effective Assistance of Counsel*

■ Hubbard also claims that his attorney was constitutionally deficient for failing to call Kevin Gentry to impeach the testimony of Peter Gabiola. Gabiola, a fellow inmate of Hubbard's, testified that Hubbard had told him that he had bought piperidine to make PCP, that he had been making PCP for several years, and that he had made a lot of

---

4. On cross-examination, Hubbard's counsel used the redaction to create the impression that Anderson did not identify Hubbard as the person with him at the garage. Consequently, the government requested that it be able to bring out on redirect that Anderson had identified "Dunno" as the "other person." Hubbard's attorney stated that he had "no problem" with the government eliciting the identity of the other person as "Dunno" on redirect and accordingly the government did so. If this constituted error, it was clearly invited error, which even if plain error, is not entitled to reversal. *United States v. Fulford,* 980 F.2d 1110, 1116 (7th Cir.1992).

money as a result. During cross-examination, Gabiola admitted knowing another inmate Kevin Gentry, but denied telling Gentry that, "I am going to go over to court and am going to lie on Hubbard so that I can help myself out because he doesn't mean anything to me."

Hubbard's attorney had originally obtained a court order for Kevin Gentry's appearance as a rebuttal witness. Gentry, however, was transferred to a different federal prison. Hubbard asked his attorney to obtain a writ for Gentry but his attorney responded that "[w]e don't need him." Hubbard argues that it was ineffective assistance of counsel for his attorney not to present the witness, or even make a showing to the jury of Gentry's unavailability.

"In reviewing a claim of ineffective assistance, we apply the familiar two-pronged test of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984): First, the defendant must prove that his counsel's performance 'fell below an objective standard of reasonableness,' and second that but for counsel's deficiency, there is a reasonable probability that the outcome would have been different." *United States v. Alex Janows & Co.*, 2 F.3d 716, 721 (7th Cir.1993) (internal citations omitted).

To determine whether Hubbard's attorney performed in an objectively unreasonable manner requires us to inquire into the attorney's thought process. There is no way to inquire on direct appeal as to why Hubbard's attorney did not call Gentry. Maybe he feared reinforcing Gabiola's testimony; maybe he did not want to remind the jury that Hubbard was being held in federal prison. We cannot know the answer to these questions without the benefit of an evidentiary hearing. That is why challenges to ineffective assistance of counsel are "best dealt with at the district court level, either through a motion for a new trial, *see* Fed.R.Crim.P. 33, or through the collateral relief available under 28 U.S.C. § 2255." *United States v. Reiswitz*, 941 F.2d 488, 495 (7th Cir.1991).

We nonetheless reject Hubbard's ineffective assistance claim because he has failed to demonstrate prejudice. *Strickland v. Washington*, 466 U.S. 668, 688–94, 104 S.Ct. at 2064–68, 80 L.Ed.2d 674 (1984). The prejudice prong of *Strickland* "requires a showing that the incompetence made the trial fundamentally unfair or made the convictions unreliable." *Alex Janows*, 2 F.3d at 722. Had Hubbard's attorney called Gentry, he at best would have impeached Gabiola's testimony. This testimony was not germane to the case. Rather, overwhelming evidence of guilt existed, including the testimony of four different DEA agents identifying Hubbard as Anderson's accomplice during the August 14 transaction; the testimony of a fifth agent identifying Hubbard as the person speaking to Anderson about the transaction in the taped conversations that took place after Anderson's arrest; and the seized evidence which included: (1) a business card with Agent Bailey's phone number; (2) a card with a reference to "ruthenium"—an ingredient of piperidine; (3) cards in the name of Hubbard's alias Robert Austin of Capital International Investments; (4) a card with handwritten names of chemicals used to dissolve PCP crystals; and (5) his pager, registered to "Robert Austin." Additionally, a subsequent search of Capital International Investments revealed an American Express statement for Robert Austin which included a charge for the rented car used during the August 14, 1991 transaction. This overwhelming evidence against Hubbard prevents him from meeting the high prejudice standard of *Strickland*. *Id.*

### C. Motion for a New Trial

Nine months after trial Hubbard received a hand-printed note purportedly written by Pete Gabiola stating:

> I had to testify or I would have gotten 12 years! So I did it. I also did it because of my mom. Since you are leaving please give me 1 pack of cigarettes.
>
> Please
>
> Pete G.

Hubbard requested a hearing to determine the authenticity of the note and its effect on Gabiola's original testimony. The court denied the motion, concluding that the note was not impeaching of Gabiola's testimony.

In effect, Hubbard's attorney was seeking an order for a new trial. Accordingly, we will treat the motion as a motion for a new trial.

We shall reverse a district court's denial of a motion for a new trial based on newly discovered evidence only if the district court has abused its discretion. We approach such motions with great caution and are wary of second-guessing the determinations of both judge and jury. It is well-established that a defendant must satisfy a stringent multi-stage test to justify a new trial on the basis of newly discovered evidence. The defendant must demonstrate that the evidence at issue: (1) came to the defendant's knowledge only after trial; (2) could not have been discovered sooner through the exercise of due diligence; (3) is material, and not merely impeaching or cumulative; and (4) would probably lead to an acquittal in the event of a new trial.

*United States v. DePriest,* 6 F.3d 1201, 1216–17 (7th Cir.1993) (internal citations omitted).

Hubbard's claim fails the third and fourth prongs. In the note Gabiola does not claim that he perjured himself—the note merely demonstrates Gabiola's motive for testifying—and given the overwhelming evidence, *see supra* 1422, a new trial is unlikely to lead to an acquittal. It was not an abuse of discretion for the district court to deny Hubbard's motion for a hearing based solely on this note.

*D. Sentencing*

Hubbard joins his co-defendant Anderson in arguing that the district court erred in sentencing him pursuant to Sentencing Guideline § 2D1.1, rather than § 2D1.11. We reject Hubbard's claim for the same reason that we rejected Anderson's. *See supra* 1419–20.

### IV. Conclusion

Sufficient evidence existed to convict Anderson of conspiring to manufacture and possess with intent to distribute PCP. The jury instructions given for Anderson concerning aiding and abetting liability were proper and sufficient. The district court also did not

err in admitting against Anderson the tape recordings of his conversations with Hubbard and the 404(b) evidence of a prior PCP sale. Anderson waived any conflict of interest his attorney might have had in representing him and, therefore, he cannot maintain a claim for ineffective assistance of counsel. The district court also did not err in sentencing Anderson under § 2D1.1 instead of § 2D1.11 because § 2D1.1 is more closely analogous to the crime for which Anderson was convicted. Finally, the district court did not err in refusing to grant Anderson a two-level reduction for acceptance of responsibility because Anderson never admitted to committing the crime for which he was charged. For these and the foregoing reasons, Anderson's conviction and sentence are AFFIRMED.

The district court did not err in denying Hubbard's motion for a severance because the redaction of Anderson's statement and the limiting instruction satisfied the *Bruton* requirements. Hubbard's ineffective assistance of counsel claim also fails because he did not satisfy the prejudice prong. The district court correctly denied Hubbard's motion for a hearing concerning the "newly discovered evidence" because the "newly discovered evidence" was at best merely impeaching and a new trial would not likely result in a different outcome. Hubbard was also properly sentenced under § 2D1.1 instead of § 2D1.11. For these and the foregoing reasons, Hubbard's conviction and sentence are AFFIRMED.